# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: June 19, 2017

**NO. S-1-SC-34252**

**STATE OF NEW MEXICO**,

Plaintiff-Appellee,

v.

**JUAN RIVAS**,

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
Mark Sanchez, District Judge

Bennett J. Baur, Chief Public Defender
David Henderson, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Kenneth H. Stalter, Assistant Attorney General
Albuquerque, NM

for Appellee

**OPINION**

**MAES, Justice.**

{1} In this case we examine the circumstances under which detectives may question a juvenile defendant in the absence of and without notification of a court-appointed attorney or court-appointed guardian ad litem. Juan Rivas's (Defendant) convictions arose from his killing of eighty-three-year-old Clara Alvarez as she slept in her bed on July 29, 2011. Defendant was fifteen years old at the time. The State filed a petition alleging several delinquent acts under the New Mexico Children's Code (Children's Code) and added an allegation that Defendant was a serious youthful offender under the Children's Code, given his charge of first-degree murder. Evidence presented at trial included two statements Defendant had made to detectives. Defendant made the first statement prior to the filing of the petition, and the second after the filing and after a detention hearing was held and guardian and counsel were appointed. Based on the evidence presented, a jury convicted Defendant of first-degree murder, aggravated burglary, tampering with evidence, and unlawful taking of a motor vehicle. Defendant was then sentenced to life imprisonment. Defendant appeals directly to this Court, as mandated by the New Mexico Constitution and our Rules of Appellate Procedure. *See* N.M. Const. art. VI, § 2; Rule 12-102(A)(1) NMRA. We affirm Defendant's convictions and sentence.

**I.      FACTS AND PROCEDURAL HISTORY**

{2}      In the early morning hours of July 29, 2011, Defendant, fifteen years old at the time, snuck into Clara Alvarez's backyard along with his thirteen-year-old friend E.S.

Alvarez was eighty-three years old and lived alone. Defendant and E.S. remained in Alvarez's backyard for about an hour. As they remained, Defendant searched for an entry point into the house, fashioned a weapon out of a stick, and dispatched E.S. to his grandmother's house to get scissors. E.S. left for his grandmother's house but did not return to Alvarez's house that day.

{3} Defendant eventually broke into the house alone. He walked through the house, entered Alvarez's bedroom, and stabbed her multiple times with his stick and a knife from her kitchen as she slept in her bed. After determining Alvarez was dead, he drove away from the house in her car. Defendant returned to the house multiple times over the next two days, enlisting his younger brother, B.R., and other friends to assist with disposal of Alvarez's body.

{4} Just after midnight on August 1, responding to a welfare check request, police officers entered Alvarez's home and found her body in the bedroom, wrapped in a mattress pad and telephone cord. The officers secured the house and called for investigation by a detective unit. Investigators later recovered a left palm print on Alvarez's washing machine, which returned a match for Defendant's print.

{5} Later that day, Sergeant Shane Blevins drove to Defendant's house, hoping to question him. As Blevins drove in the vicinity of the house, he passed a woman and a young man on foot. When he arrived at the house, he observed a vehicle matching the description of the vehicle taken from Alvarez's house. Blevins then returned to the people he had passed on the street, identified himself as a police officer, and

asked the young man his name. The young man replied by giving the name B.R. and explained the woman with him was his mother. Blevins told them he was looking for Juan Rivas. On further questioning, Mrs. Rivas and the young man agreed to accompany Blevins in his police cruiser to the police station to answer additional questions. With the two in tow, Blevins drove back to Defendant's house briefly to drop off the Rivases' dog, and they arrived just as two other individuals were arriving. The two individuals identified themselves as Juan Rivas Sr. (Mr. Rivas) and B.R. Based on those revelations, Blevins soon learned the young man who had previously identified himself as B.R. was actually Juan Rivas Jr.—Defendant in this case. Officers then drove Defendant and his parents to the station for questioning.

{6} Defendant arrived at the station at around 9:30 p.m. that evening, and officers placed him in an interview room.[1] Detective Nathan Eubank entered the room and introduced himself, and Defendant did the same. Eubank asked Defendant for his date of birth; Defendant responded by asking, "Why?" Eubank explained he was investigating a murder and needed to establish some preliminary information before they could talk about it. "All right," Defendant replied.

{7} Eubank then explained he would read Defendant certain rights he was granted as a juvenile, and Defendant asked, "Why a juvenile, though?" Eubank explained the State was "very particular" about Defendant's rights because he was a juvenile, under

---

[1] The interview was recorded and introduced at trial as State's Exhibit 235.

3

eighteen years of age. Defendant acknowledged the explanation, and Eubank added that Defendant should say something if he failed to understand any of the rights read. Defendant replied, "Yes, sir." Eubank reiterated that he was investigating a murder and then read Defendant an explanation of various rights, verbatim, from a New Mexico juvenile advice of rights form.

{8} Once finished, Eubank asked if Defendant had understood it all, and Defendant hesitated, wondering about "the last one." Eubank explained again that Defendant had the right to have an attorney present as Eubank asked questions, that Defendant was not required to speak with Eubank at all, and that if he did speak, he had the right to stop speaking at any time. On hearing that, Defendant asked, "Oh, so I just stop talking to you?" Eubank replied, "Yeah, you just say, 'I don't want to talk anymore.' " Defendant suggested he understood, responding, "All right, then, man." Eubank asked Defendant to print and sign his name on the advice of rights form, which would signify "that he understood all of that," and Defendant did so.

{9} Eubank then showed Defendant text at the bottom of the advice of rights form, asked him to read it, and asked him to indicate by marking where specified whether he was willing to speak with Eubank. Defendant read the text aloud, which inquires of individuals being questioned: "[a]fter being advised of your rights and with those rights in mind, do you wish to voluntarily give up those rights and talk to me now?" Defendant responded affirmatively and indicated his affirmation by marking "yes" as specified on the form. After Defendant had signed and marked the form, Eubank

4

noted that with the legal "mumbo jumbo" out of the way, they could discuss the matters Eubank was investigating.

{10} Defendant explained he had chosen Alvarez's house to burglarize because he "liked her car." He had "just got angry" that night, he noted, and it had gotten out of hand. He and E.S. had been together in Alvarez's backyard, but eventually he had "socked out" E.S., causing him to leave. Defendant had ripped open a window screen to gain entry to the house, he explained, and he had then walked from the laundry room to Alvarez's bedroom. He had, he noted, taken a "stick" from Alvarez's backyard into the bedroom. Eubank asked if Alvarez had looked at Defendant at that point; Defendant responded that she "didn't have a chance" and that he "was just laughing" as he stabbed her repeatedly with the stick. Defendant acknowledged he had taken a knife from Alvarez's kitchen and had stabbed her with that as well. He left the stick, he noted, in Alvarez's bedroom. He maintained throughout the interview that he had acted alone in breaking into Alvarez's house and killing her.

{11} Eubank then asked where Defendant had stabbed Alvarez. "I don't know," Defendant responded, "I was just going at her"; he added he could feel "happy" only after he "got out" all of his anger. That accomplished, he noted, he had taken rosaries, jewelry, and money from Alvarez's house. He then burned his clothes, washed and disposed of his shoes, and told his mother the police would find him. As Defendant described the jewelry he had taken from Alvarez's house, Eubank asked Defendant if earlier he had been wearing a ring that belonged to Alvarez. Defendant

5

responded that he had been and asked Eubank if he wanted it. Defendant briefly searched his pockets, located the ring, and handed it to Eubank, confirming he had taken it from Alvarez's house. Defendant acknowledged he had done some very "serious" things. Eubank asked Defendant if he had any remorse—to which Defendant responded, "Nah."

{12} On August 2, 2011, the State filed a delinquency petition in children's court, alleging Defendant had committed first-degree murder, aggravated burglary, tampering with evidence, and unlawful taking of a motor vehicle. The same day, the State added a motion to join Juan Rivas Sr. as a party to the petition. Defendant was held in a juvenile detention facility.

{13} Defendant appeared in children's court on August 3 for a detention hearing, as prescribed by statute. At that hearing—Defendant's first appearance in court in the proceeding—the district judge advised Defendant he had various rights, including a right to representation by an attorney at all stages of the proceedings. The district judge then appointed a public defender for Defendant, and the public defender shortly thereafter entered a not guilty plea on Defendant's behalf. Based on information Mr. Rivas might have knowledge regarding the incidents of that evening and might have interests diverging from Defendant's, an assigned juvenile probation officer recommended a guardian ad litem be appointed to represent Defendant's best interests. Based on that recommendation, the court appointed Defendant a guardian ad litem but made no other specific findings supporting the appointment. The court's

6

written order specified only that "[t]he child has no parent, guardian or custodian appearing on behalf of the child, or his/her interests are in conflict with those of the child."

{14} The State also filed on August 3 a notice of intent to seek an adult sentence, alleging that Defendant was a serious youthful offender. The children's court ordered the case set for a preliminary hearing before the district court.

{15} The district court held the preliminary hearing a few months later, on November 17, 2011. After finding probable cause on each of the charges, the judge bound Defendant over for trial in district court on each of the four counts. Defendant was arraigned in district court on December 19, 2011.

{16} In the interim, as Defendant awaited his preliminary hearing in district court, Mr. Rivas called Eubank on August 5 and left a message indicating Defendant had an urgent desire to speak with Eubank. On August 6, Eubank and his colleague, Detective Conger, visited with Defendant at the juvenile detention center, where he was being held. Eubank explained Defendant's father had left word with the detectives that Defendant hoped to speak with them, and asked if that was true. Defendant responded affirmatively.

{17} Much as he had a few days prior when they first met, Eubank read Defendant the script verbatim from the standard juvenile advice of rights form and asked Defendant to indicate where appropriate on the form if he wished to speak with the detectives. And again, Defendant indicated he would indeed speak with them.

{18} At this meeting, however, Defendant gave an account different from the one he had given a few days earlier. Defendant maintained that E.S. had actually participated in killing Alvarez and that it had been E.S.'s plan all along. Moreover, Defendant added, E.S. had revealed he was following directions from a person named "Scooby." Scooby was apparently "big and connected," Defendant explained, and had numerous tattoos. Defendant acknowledged in this account that he had stabbed Alvarez, but he reported E.S. had retrieved and actually used the knives from the kitchen. It was also E.S.'s idea, Defendant added, to take the money and jewelry from the house. E.S. had advised Defendant to take the blame, Defendant insisted, and had promised to "help" should Defendant be caught.

{19} Defendant's case was set for trial in December 2012. On December 6, 2012, just two business days before trial was scheduled to begin, Defendant's counsel moved to suppress the second statement Defendant had made to the detectives. Eubank had made no effort to contact Defendant's counsel prior to the second interview, counsel noted, and thus he contended the interview had violated Defendant's federal and state constitutional rights to counsel, as well as his statutory right to counsel provided by the Children's Code. Defendant's counsel made reference to the statement Defendant gave in his second interview as Defendant's "second" statement, and he explained a failure to move to suppress this second statement would render him "doubly ineffective." Defendant's counsel made no motion of any kind, however, with respect to the first statement.

8

{20} The State advanced two arguments in response. The motion was untimely under Rule 5-601 NMRA, the State noted, and its appearance on the eve of what promised to be a lengthy trial was highly prejudicial. And regardless of the timeliness of the motion, the State added, no right had been violated because Defendant had knowingly, voluntarily, and intelligently waived his rights prior to giving the statement.

{21} The district court heard argument on Defendant's motion on the day of jury selection—the opening day of trial. The court reviewed an audio recording of a phone call between Eubank and Mr. Rivas, a recording of Defendant's second interview with the detectives, and the standard advice of rights and waiver form Defendant had read and signed in the course of both the August 1 and August 6 interviews. After hearing arguments from the parties, the court noted the motion was untimely and should be denied on that ground alone. But even on the merits, the court explained, the record revealed Defendant had desired to speak with the detectives, he had been adequately advised regarding his rights, and he had understood and answered questions appropriately in the interview. Those factors, the district court concluded, indicated Defendant had known he had a right to an attorney and he had knowingly and voluntarily waived the right. The district court thus denied the motion and took up the trial as scheduled.

{22} The State presented a comprehensive case at trial, including numerous witnesses and at least two hundred exhibits, which included recordings of

Defendant's two separate interviews with the detectives. Defendant was eventually convicted of all four counts—first-degree murder, aggravated burglary, tampering with evidence, and unlawful taking of a motor vehicle—and sentenced to a term of life imprisonment. Defendant appealed directly to this Court, contending (1) his various trial counsel were ineffective for failing to move to suppress statements he made in his August 1 interview, and (2) the district court erred in denying suppression of statements he made in his August 6 interview. *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."); Rule 12-102(A)(1).

## II.     STANDARDS OF REVIEW

### A.     Ineffective Assistance of Counsel

{23}     We review claims of ineffective assistance de novo. *State v. Crocco*, 2014-NMSC-016, ¶ 11, 327 P.3d 1068. A defendant seeking to establish ineffective assistance must show both deficient performance of counsel and prejudice caused by the deficient performance. *State v. Tafoya*, 2012-NMSC-030, ¶ 59, 285 P.3d 604; *State v. Jacobs*, 2000-NMSC-026, ¶ 48, 129 N.M. 448, 10 P.3d 127. In evaluating performance, we aim to avoid the distorting effects of hindsight, and if counsel's conduct may be characterized as a component of a plausible or rational strategy or tactic, we presume counsel's performance was within the bounds of acceptable representation. *State v. Arrendondo*, 2012-NMSC-013, ¶ 38, 278 P.3d 517. Typically, we prefer that ineffective assistance claims be brought in collateral

10

proceedings so that defendants may adequately develop a record of counsel's conduct. *State v. Astorga*, 2015-NMSC-007, ¶ 17, 343 P.3d 1245. When a defendant establishes a prima facie case of ineffective assistance on direct appeal, however, we may remand the claim to the trial court for an evidentiary hearing and a ruling. *Arrendondo*, 2012-NMSC-013, ¶ 38.

**B.      Suppression Based on a Claim of Ineffective Waiver**

{24}      When reviewing a district court's denial of a motion to suppress inculpatory statements, we defer to the district court's factual findings "unless they are clearly erroneous, and [we] view the evidence in the light most favorable to the district court's ruling." *State v. Gutierrez*, 2011-NMSC-024, ¶ 7, 150 N.M. 232, 258 P.3d 1024 (internal quotation marks and citation omitted). We review de novo, however, the legal question of whether valid waiver has been made. *Id.*

**III.    DISCUSSION**

{25}      On appeal, Defendant contends the various counsel he was appointed during his proceeding below were as a group ineffective for failing to move to suppress statements he made in his August 1 interview with Eubank prior to the State's filing of the delinquency petition. Those statements, Defendant insists, were elicited in violation of his statutory and constitutional rights to counsel, and the circumstances surrounding the interview rendered any waiver he gave invalid. Defendant adds, as a second contention, that the district court erred in denying suppression of the statements he made in his post-delinquency petition during the August 6 interview

with the detectives; they too, Defendant contends, were elicited in violation of applicable rights to counsel, and any waiver he may have given was again invalid. The State responds by arguing Defendant's motion to suppress the August 6 statements was untimely, and regardless, Defendant gave valid waivers in both instances. The timeline of events is significant for purposes of analyzing Defendant's claims.

**A.      The August 1 Interview and Defendant's Claim of Ineffective Assistance**

{26}    At the time of Defendant's August 1 interview with Eubank, he was fifteen years old, and the State had not yet filed its petition alleging delinquency. Given those facts, our prior cases make clear that specific provisions of the Children's Code must guide our examination of Defendant's statements. *State v. Martinez*, 1999-NMSC-018, ¶¶ 17-18, 127 N.M. 207, 979 P.2d 718 (concluding Children's Code provisions applied to juvenile questioned by police prior to filing of delinquency petition); *see generally* NMSA 1978, § 32A-2-14 (2009).

{27}    Application of the Children's Code provisions may be consequential because the provisions grant juveniles protections against self-incrimination above and beyond those provided by the Fifth Amendment to the United States Constitution and Article II, Section 15 of the New Mexico Constitution. *See, e.g.*, *State v. DeAngelo M.*, 2015-NMSC-033, ¶ 6, 360 P.3d 1151. The federal and state constitutional

provisions provide protections against self-incrimination and require, at a minimum, that before any individual may be subjected to custodial interrogation, the individual must be made aware of various rights the courts have established to aid in protecting the right to be free from self-incrimination. *See, e.g.*, *Martinez*, 1999-NMSC-018, ¶ 13; *see generally Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Moreover, the cases explain, prior to questioning and later using any statements or admissions gleaned from these scenarios, investigators and officers must obtain from the individual a knowing, intelligent, and voluntary waiver of those established rights. *Miranda*, 384 U.S. at 479; *Martinez*, 1999-NMSC-018, ¶ 13.

{28}     The Children's Code provisions bolster those protections against self-incrimination in various ways for children. Statements made by young children, for example, are without exception inadmissible at trial, regardless of any waiver made; statements made by children thirteen and fourteen years old are presumptively inadmissible, regardless of any waiver made; and for children fifteen and older, any waiver of rights is subject to specific statutory inquiry before it may be found knowingly, intelligently, and voluntarily made. Section 32A-2-14(E)-(F). In addition, though the constitutional protections recognized in *Miranda* apply generally only in situations featuring custodial interrogation, the Children's Code protections

apply more broadly—in any scenario after a child has been subject to formal charges, in any scenario in which a child is subject to an investigative detention, and perhaps in any scenario at all in which a child is "suspected of being a delinquent child." Section 32A-2-14(C); *see State v. Javier M.*, 2001-NMSC-030, ¶ 38, 131 N.M. 1, 33 P.3d 1; *id.* ¶ 50 (Minzner, J., specially concurring) ("[T]he Legislature . . . intended to grant a further statutory right to a child who is alleged or suspected of being a delinquent child . . . ." (internal quotation marks and citation omitted)).

{29} The parties have no quarrel regarding application of these expanded protections to Defendant's August 1 interview with Eubank. Instead, they dispute whether Defendant validly waived his right against self-incrimination, even given application of the expanded protections and the specific statutory considerations guiding our analysis. Defendant's claim of ineffective assistance here turns on the validity of the waiver given in the August 1 interview. If the waiver was valid, Defendant's proffered ground for potential suppression below recedes along with his narrow claim of ineffective assistance.

{30} Our cases examining the federal and state constitutional right to be free from self-incrimination have set forth several general principles guiding the evaluation of whether waiver has been knowingly, intelligently, and voluntarily, and thus validly,

made. We require that the waiver be made by " 'free and deliberate choice' " and absent " 'intimidation, coercion, or deception[.]' " *Martinez*, 1999-NMSC-018, ¶ 14; (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The waiver, moreover, must have been made with "full awareness" of the nature of the right abandoned, and "full awareness" of "the consequences of the decision to abandon it." *Id.* (internal quotation marks and citation omitted). In making those determinations, courts must consider "the totality of the circumstances and the particular facts," must consider "the mental and physical condition, background, experience, and conduct of the accused," and must consider "the conduct of the police[.]" *Martinez*, 1999-NMSC-018, ¶ 14 (internal quotation marks and citation omitted). And courts must entertain, we have explained, "every reasonable presumption against waiver." *Id.* (alteration in original) (internal quotation marks and citation omitted).

{31} For waivers made by juveniles, the Children's Code further sharpens the focus of the analysis. *See* § 32A-2-14(E). Section 32A-2-14(E) directs courts to consider various factors in making validity determinations for juveniles. Those factors include the child's age and education; custodial status; the manner in which the rights have been advised; the length and circumstances of questioning; the condition of the quarters in which questioning occurs; the time of day and treatment of the child

15

during questioning; the mental and physical condition of the child at the time of questioning; and whether the child had the counsel of an attorney, friend, or relative at the time of questioning. *Id.* Consideration of these factors refines for juvenile waivers the more generally-applicable totality-of-the-circumstances inquiry, and emphasizes "some of the circumstances that may be particularly relevant for a juvenile, such as the presence of a relative or friend." *Martinez*, 1999-NMSC-018, ¶ 18.

{32} Examination of those considerations here is instructive. Defendant was fifteen at the time of the interview. The record does not reveal his educational level, but at the same time, nothing in the record indicates he lacked "sufficient intelligence to understand" his rights or the repercussions of waiving those rights. *Gutierrez*, 2011-NMSC-024, ¶ 14 (internal quotation marks and citation omitted). New Mexico case law has made clear that children of similar age, even those suffering from "conditions and disorders" significantly affecting their cognitive abilities, may nonetheless be capable of understanding their rights and the consequences of waiver. *State v. Setser*, 1997-NMSC-004, ¶ 14, 122 N.M. 794, 932 P.2d 484; *see also Gutierrez*, 2011-NMSC-024, ¶¶ 14-15 (internal quotation marks and citation omitted); *cf. State v. Jonathan M.*, 1990-NMSC-046, ¶ 8, 109 N.M. 789, 791 P.2d 64

16

(comparing older children with children "under age fifteen" and concluding "a child over age fifteen is unlikely to make an involuntary statement in a noncustodial, noncoercive atmosphere or after receiving *Miranda* warnings").

{33}     Neither age nor any other factor, however, is to be viewed in isolation—both the statute and our case law mandate consideration of all relevant circumstances. Defendant had no prior record. The interview here occurred at 9:30 in the evening at the Hobbs police station. He had been accompanied to the station by his parents and had been made to wait just a few minutes before the interview began. Just one officer—Eubank—conducted the questioning, and his conversational tone was cordial, even chummy. Very little information was exchanged before he began advising Defendant regarding his rights. The advisement itself took two forms: Eubank read aloud from a standard advice of rights form, and then Defendant was given an opportunity to read, and read aloud from, the form before signing and indicating a desire to speak. Defendant asked relevant follow-up questions, suggesting he understood the meaning of the language used. While the interview lasted about an hour, at no time did Eubank's demeanor, or Defendant's demeanor, change such that problematic inferences might arise regarding Defendant's treatment. The record does reveal that Defendant did not speak to any attorney, friend, or

relative at any time during the interview. And finally, no evidence suggests he suffered from any impairment of mental or physical condition that might give us pause in the analysis.

{34} We have found juvenile waivers intelligently, knowingly, and voluntarily made in similar scenarios and have emphasized the absence of coercive or manipulative circumstances. In *Martinez*, for example, where an interview occurred at the same hour in the evening, as in this case, and lasted for about an hour, the record revealed no evidence of mental or physical impairment; a standard *Miranda* script was read; and the defendant answered questions clearly and without resistance and never requested consultation with counsel, relative, or friend, we found a valid waiver—even in the absence of the signed waiver Defendant produced here. *Martinez*, 1999-NMSC-018, ¶¶ 22-23. And in *Gutierrez*, we found that a primarily Spanish-speaking juvenile with some cognitive impairment may validly waive his rights, given a demonstration of English fluency sufficient to understand those rights, an established familiarity with the juvenile justice system, and a record of immediate and detailed narrative responses relevant to the questions asked by the interviewer—again in the absence of a signed waiver form, and again in the absence of consultation with friend, relative, or counsel. 2011-NMSC-024, ¶¶ 15-17.

{35} Based on our constitutional case law, our statutory provisions, and a consideration of the totality of the circumstances here—including Defendant's age, the form of advisement, his explicit written waiver, his appropriate responses, and the absence of countervailing factors—we cannot conclude Defendant lacked full awareness of the rights abandoned here, nor can we conclude he lacked full awareness of the consequences of abandoning those rights. And nothing in the record suggests the presence of intimidation, deception, or coercion, or a lack of free and deliberate choice; thus none of those factors affect the validity analysis here. Accordingly, Defendant knowingly, intelligently, and voluntarily waived his rights in the August 1 interview. And because the record would not have supported a motion to suppress statements made in that interview on the basis of invalid waiver, Defendant has not made a prima facie case of ineffective assistance. *See, e.g.*, *Crocco*, 2014-NMSC-016, ¶ 24. As we have often explained, however, "[i]f facts beyond those" in this record may establish a claim of ineffective assistance, nothing precludes Defendant from asserting the claim and addressing the facts in a collateral proceeding. *Id.*

**B.    The August 6 Interview and Defendant's Claim of Right to Counsel**

{36} With respect to suppression of statements Defendant made in his August 6 interview, the State points out as a preliminary matter that Defendant's motion came on the very eve of trial—clearly untimely under both the version of Rule 5-212(C) NMRA then in effect, which required the filing of suppression motions "within twenty (20) days of the entry of a plea," and the current version of the rule, which requires filing "no less than sixty (60) days prior to trial." Rule 5-212(C) (2012); Rule 5-212(C) (2013). The version then in effect, as it does now, gave the district court the ability to waive that requirement for good cause shown, but the court declined to find good cause here. Rule 5-212(C) (2012); Rule 5-212(C) (2013).

{37} Despite concluding Defendant's motion was untimely, however, the district court offered an alternative ruling on the merits, after having heard from both parties on the merits. In similar circumstances, various appellate tribunals have been willing to review not just the trial court's ruling on timeliness but the merits themselves, reasoning that when the trial court rules on the merits of an untimely suppression motion, the court has also implicitly found cause to grant relief from forfeiture of the right to seek suppression. *See, e.g.*, *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012). Other appellate courts have added the government may forfeit its untimeliness claim where it responds on the merits on appeal, as it has done here.

20

*See, e.g.*, *United States v. Scalzo*, 764 F.3d 739, 743-44 (7th Cir. 2014). Given the airing of the merits arguments from both sides below and on appeal, given the district court's denial on the merits, and given the nature of this claim, we conclude the suppression issue has been adequately presented for our review. *See* Rule 12-321(A) NMRA (requiring that "a ruling or decision by the trial court was fairly invoked" for preservation purposes).

{38} The basic dispute between the parties resembles the dispute regarding the August 1 interview: Defendant again contends the August 6 interview violated his right to counsel, while the State contends he again validly waived that right after an adequate advisory and his resulting signature on the waiver form. As the parties recognize, however, the August 6 interview, coming as it did after the State filed its petition and after Defendant had been appointed counsel, calls for a separate analysis.

{39} Once the adversary judicial process has been initiated as it was with the August 2 filing of the petition here, the Sixth Amendment to the United States Constitution and Article II, Section 14 of the New Mexico Constitution guarantee defendants the right to have counsel present at all critical stages of criminal proceedings. *See, e.g.*, *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009); *State v. Padilla*, 2002-NMSC-016, ¶ 11, 132 N.M. 247, 46 P.3d 1247. Any interrogation by

21

the state once proceedings have begun, regardless of a defendant's custodial status, constitutes a critical stage for purposes of the Sixth Amendment analysis, and thus the parties do not dispute attachment of the Sixth Amendment right in this case. *See Montejo*, 556 U.S. at 786. The Sixth Amendment right may be waived much like the Fifth Amendment right against self-incrimination at issue in the August 1 interview, as long as the relinquishment is voluntary, knowing, and intelligent, and a defendant may often validly waive this Sixth Amendment right after receiving only the warnings prescribed by *Miranda*, which has its source in the Fifth Amendment. *See Montejo*, 556 U.S. at 786-87; *cf. Patterson v. Illinois*, 487 U.S. 285, 296 n.9 (1988) ("[B]ecause the Sixth Amendment's protection of the attorney-client relationship . . . extends beyond *Miranda*'s protection of the Fifth Amendment right to counsel, . . . there will be cases where a waiver which would be valid under *Miranda* will not suffice for Sixth Amendment purposes." (internal quotation marks and citation omitted)).

{40} The Sixth Amendment right to counsel and its New Mexico counterpart, however, differ from the Fifth Amendment right against self-incrimination at stake in the August 1 interview in various ways. The Sixth Amendment right is narrower in at least one sense—it is offense-specific, unlike *Miranda*'s Fifth Amendment right against self-incrimination—and is thus of no help with respect to questioning

regarding matters not yet subject to adversarial proceedings. *See McNeil v. Wisconsin*, 501 U.S. 171, 175-76 (1991). In many other ways, however, Sixth Amendment protection may be understood as broader than the Fifth Amendment protection. The Sixth Amendment right, the Supreme Court has explained, is integral to the protection of fundamental rights of criminal defendants and ensures fairness throughout the criminal proceeding. *Massiah v. United States*, 377 U.S. 201, 205 (1964). In advancing those goals, the Sixth Amendment guarantees defendants the right to rely on counsel as intermediary between themselves and the State—not just at trial, but from the time of initiation of criminal proceedings onward, " 'when consultation, thorough-going investigation and preparation [are] vitally important' " for purposes of promoting fundamental fairness. *Massiah*, 377 U.S. at 205 (alteration in original) (quoting *Powell v. Alabama*, 287 U.S. 45, 57 (1932)); *see also Maine v. Moulton*, 474 U.S. 159, 172 n.9, 176 (1985).

{41} Cases examining early attachment of the right have recognized that even pretrial proceedings may be momentous; they may "well settle the accused's fate and reduce the trial itself to a mere formality." *United States v. Wade*, 388 U.S. 218, 224 (1967). Highlighting that proposition, we have previously observed the risk not only of unwise waiver by the uncounseled defendant, but the even " 'more significant risk

23

of inaccurate, sometimes false, and inevitably incomplete' " accounts of events in question. *In re Howes*, 1997-NMSC-024, ¶ 28, 123 N.M. 311, 940 P.2d 159 (quoting *People v. Hobson*, 348 N.E.2d 894, 899 (N.Y. 1976)).  The right to counsel has thus long protected "the unaided layman" at any "critical confrontations with his adversary," *United States v. Gouveia*, 467 U.S. 180, 189 (1984),  and in any situation in which the defendant may need the "guiding hand of counsel" to resist the coercive powers of the prosecutorial process.  *Powell v. Alabama*, 287 U.S. 45, 57, 69 (1932) (describing the post-arraignment period as "perhaps the most critical period of the proceedings").  Counsel is crucial, the Supreme Court has explained, at any point a defendant is immersed in the complexity of the criminal legal environment—at any point the "intricacies" of criminal law constrain his ability to defend himself. *Rothgery v. Gillespie Cty.*, 554 U.S. 191, 207 (2008) (internal quotation marks and citation omitted).  The Sixth Amendment right, in other words, aims to level the playing field; it contemplates counsel as both strategist and shepherd at each stage to promote the goals of fairness and integrity throughout the proceeding.  *See United States v. Ash*, 413 U.S. 300, 309 (1973) (explaining purpose of counsel is to "minimize imbalance in the adversary system").

24

{42} Counsel's leveling function is all the more critical for children. Children lack maturity and well-developed senses of responsibility; absence of either may result in impulsive action or decision. *See Roper v. Simmons*, 543 U.S. 551, 569 (2005). Lags in neurological and psychosocial development related to reasoning, risk-taking, and impulse control render children less competent than adults in various ways that may be relevant in a criminal proceeding—as just one illustration, diminished perception, decision-making, and judgment may make them more suggestible and susceptible to any number of outside influences. *Id.*; *see also Miller v. Alabama*, 567 U.S. 460, __, 132 S. Ct. 2455, 2464 (2012) ; *Graham v. Florida*, 560 U.S. 48, 68 (2010) ("[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.").

{43} These lags gain special prominence for children in settings involving interrogation, regardless of whether the interrogation occurs before or after criminal proceedings have been initiated. The pressure of interrogation, the Supreme Court has recognized, is "so immense," that it may "induce a frighteningly high percentage of people to confess to crimes they never committed." *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011) (internal quotation marks and citations omitted). The risk "is all the more troubling" and "all the more acute," the *J.D.B.* Court added, when the

subject of interrogation is a child. *Id.*; *see also Haley v. Ohio*, 332 U.S. 596, 599 (1948) ("That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens."). Lack of experience, perspective, and judgment, in other words, often leave children without the ability to "recognize and avoid" various choices detrimental to them, and those choices may frequently arise in interrogation, just as they may at any stage of a criminal proceeding. *See J.D.B.*, 564 U.S. at 272. That a child will experience police questioning in many ways distinct from an adult is a "commonsense reality." *Id.* at 265. Children, then, have a unique need for the guidance of counsel every step of the way and a unique need for "specific consideration" of whether they might appropriately waive that guidance. *In re Gault*, 387 U.S. 1, 42 (1967); *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962) (recognizing a juvenile "cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions"). And an open question remains in the federal case law as to whether these defining characteristics of youth might require various "additional procedural safeguards" so as to satisfy the child's federal constitutional rights. *See J.D.B.*, 564 U.S. at 269-70, 270 n.4.

{44} Recognizing these principles, numerous other jurisdictions have established, by statutory scheme, special protections for children subject to police questioning,

26

both before and after attachment of the Sixth Amendment right. Some require that a parent or guardian be present at questioning, or before a child may validly waive the right to counsel. *See, e.g.*, Conn. Gen. Stat. Ann. § 46b-137(a) (West 2012) (statements of a child under sixteen inadmissible unless made in the presence of a parent or guardian who has been advised of the child's rights); Miss. Code Ann. § 43-21-303(3) (West 1980) (police must extend invitation to parent or guardian to be present for child's interrogation). Others require the presence of parent or counsel. *See, e.g.*, Ind. Code Ann. § 31-32-5-1(3) (West 1997); N.D. Cent. Code Ann. § 27-20-26(1) (West 2012); *cf.* Colo. Rev. Stat. Ann. § 19-2-511(1) (West 1999). Still others direct that waiver can be made *only* with the assistance of counsel. Tex. Fam. Code Ann. § 51.09(1) (West 1997); W. Va. Code Ann. § 49-4-701(l) (West 2016).

{45} Other appellate decisions have established similarly heightened protections in both the Fifth and Sixth Amendment counsel contexts. Some have required the presence of a parent before a valid waiver may be made. *See, e.g.*, *In re Steven William T.*, 499 S.E.2d 876, 884 (W. Va. 1997); *see also In re K.W.B.*, 500 S.W.2d 275, 283 (Mo. Ct. App. 1973); *In re Aaron D.*, 290 N.Y.S.2d 935, 937-38 (N.Y. App. Div. 1968). Others have recognized the presence or encouragement of a parent may often weigh against the validity of waiver—for any number of reasons, including lack

27

of comprehension or competence, and the significant risk of conflict. *See, e.g.*, *In re A.S.*, 999 A.2d 1136, 1150, 1150 n.6 (N.J. 2010); *Steven William T.*, 499 S.E.2d at 886 (reversing lower court's juvenile transfer order based in part on custodian's "adverse interests"); *see also Commonwealth v. Philip S.*, 611 N.E.2d 226, 231 (Mass. 1993) (observing adult may "lack[] capacity to appreciate the juvenile's situation and to give advice"). Many, recognizing those risks, have suggested "meaningful consultation" with an attorney or a disinterested parent or adult should ordinarily be a prerequisite to finding valid waiver in these scenarios. *See, e.g.*, *In re B.M.B.*, 955 P.2d 1302, 1310, 1311, 1312-13 (Kan. 1998) (internal quotation marks and citations omitted); *Commonwealth v. MacNeill*, 502 N.E.2d 938, 942 (Mass. 1987). Moreover, other courts have observed, the Sixth Amendment right may attach automatically for juveniles—it need not be explicitly invoked by an unknowing child, given the critical constitutional protection it is intended to provide in leveling an inherently unbalanced playing field. *See, e.g.*, *In re Darryl P.*, 63 A.3d 1142, 1190-91 (Md. Ct. Spec. App. 2013). And of course, other courts, highlighting the oft-intertwined guarantees of due process, protection against self-incrimination, and effective assistance of counsel have concluded a defendant may *never* waive the right to counsel in the absence of

counsel; the right is "indelible," regardless whether exercised by adult or child. *See People v. Grice*, 794 N.E.2d 9, 10 (N.Y. 2003).

{46} As noted, our Legislature, clearly cognizant of the ways in which children experience the adversarial process differently, has also established special protections for juveniles in our Children's Code. A buffer, for example, between child and investigator already exists at the charging stage: officers must refer any allegations of delinquency to a juvenile probation office, which makes its own inquiry and recommendation to the children's court as to whether a delinquency petition is appropriate. *See, e.g.*, NMSA 1978, § 32A-2-7(A) (2005). Upon filing a petition, moreover, the children's court must appoint counsel if the child has not already retained an attorney and, at any point in the proceeding, may in addition appoint a guardian to advocate for the child's best interests, which are not often coextensive with the family's interests or even the child's legal interests. *See* § 32A-2-14(H), (J), (K). The Children's Code provisions also require that the court advise both the child and any parent, guardian, or custodian that counsel will represent the child at all stages of the proceeding, evincing an intent to provide both the child and any interested parties with the information that the child is entitled to rely on counsel as intermediary in every adversarial encounter along the way. Section 32A-2-14(H).

29

{47}     While the Sixth Amendment right must often be explicitly asserted before it offers its protection in the context of police questioning, both the case law examining the juvenile experience in adversarial settings and our statutory provisions suggest the explicit invocation requirement is both inappropriate and unworkable for children. *Compare Darryl P.*, 63 A.3d at 1190 ("The prophylactic right to counsel only comes into existence when it is unambiguously invoked . . . . [T]he constitutional right to counsel, by contrast, comes into existence automatically, whether invoked or not . . . ."); *with State v. Desnoyers*, 2002-NMSC-031, ¶ 18, 132 N.M. 756, 55 P.3d 968 (concluding adult defendant had not asserted Sixth Amendment right based on failure to make an affirmative request at time of questioning), *abrogated on other grounds by State v. Collier*, 2013-NMSC-015, ¶¶ 12, 14, 301 P.3d 370. The sequence of events here illustrates just a part of the problem with the invocation requirement. Defendant, having been appointed counsel a few days prior, was then held in detention until the August 6 interview and had, apparently, no contact with counsel in that intervening period. Officers then approached Defendant based on contact from his father, asked if he was receptive to questioning, and then read him the same standard-form *Miranda* script—advising him he had a right to an attorney and the right to have one appointed—they had read him five days earlier. But clearly the

30

circumstances were different on August 6, and the case law suggests the likelihood was exceedingly low that Defendant understood the significance of the information he had just received and that he could reconcile that information with the fact that he had already been appointed both an attorney and a guardian. *See, e.g.*, *Montejo*, 556 U.S. at 813 n.8 (Stevens, J., dissenting) (noting high likelihood of confusion in this scenario for "vulnerable defendants," including juveniles); *cf. In re Edwin S.*, 977 N.Y.S.2d 601, 603 (N.Y. Fam. Ct. 2013) (examining scenario where language of *Miranda* warning "can only serve to confuse [the] detainee with respect to the timing of his/her right to an attorney").

{48}    Ethics rules and decades of departmental training suggest that the better practice for the officers here would have been to refrain from approaching Defendant once counsel was appointed, regardless of Defendant's age; his juvenile status compounded the constitutional risks. *See, e.g.*, Rule 16-402 NMRA; *Montejo*, 556 U.S. at 793 ("If a State *wishes* to abstain from requesting interviews with represented defendants when counsel is not present, it obviously may continue to do so." (emphasis in original)); *State v. Forbush*, 2011 WI 25, ¶ 54, 796 N.W.2d 741 (plurality opinion) (noting "it's incumbent on" investigating officers to inquire about an attorney before questioning "when it's been advised to the DA's Office that there

is an attorney" (internal quotation marks omitted)); ABA Model Rules of Professional Conduct, Rule 4.2 at 117 (2016); *accord Gallegos*, 370 U.S. at 54 (explaining a juvenile "would have no way of knowing what the consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself"); *cf.* Federal Bureau of Investigation, Legal Handbook for FBI Special Agents § 7-4.1(7) at 95-96 (2003) (directing that "no interview of the accused may take place . . . unless . . . the accused's counsel is present," an additional waiver is obtained, or certain extenuating circumstances exist).

{49}     That Defendant had also been appointed a guardian here both magnified and intensified the problem.  The guardian, of course, had been appointed to stand in the place of Defendant's parents and had been appointed based largely on a potential conflict of interest between Defendant and Mr. Rivas.  *See* § 32A-2-14(J).  The question of why the investigators felt entitled to rely on Mr. Rivas's initiation of contact on Defendant's behalf under these circumstances has gone unaddressed by the parties, but the Children's Code provisions suggest that reliance was misplaced. *Id.*

{50} The defining characteristics of youth recognized by those cases and the attendant risks, coupled with the various legislative directives of our Children's Code provisions, compel us to conclude that children are different and must be treated differently for purposes of the Sixth Amendment counsel analysis. Accordingly, the juvenile Sixth Amendment right to counsel is absolute and indelible; once the right has attached, it may not be waived outside the presence of counsel. *See, e.g.*, *Grice*, 794 N.E.2d at 10 ("[I]nterrogation is prohibited unless the right is waived in the presence of counsel."); *see also Darryl P.*, 63 A.3d at 1191 ("The constitutional right against uncounseled interrogation is significantly broader than the prophylactic right against uncounseled self-incrimination."); *cf. State v. Lawson*, 297 P.3d 1164, 1173 (Kan. 2013) ("[A]fter the statutory right to counsel has attached, the defendant's uncounseled waiver of that right will not be valid unless it is made in writing and on the record in open court.").

{51} The district court thus need not have engaged in the statutory waiver inquiry as it did here. Instead, once the record had established the Sixth Amendment right had attached and Defendant was questioned without counsel present, the district court had no alternative but to suppress Defendant's statements in their entirety.

33

Accordingly, the district court erred in denying Defendant's motion to suppress the statements made in the August 6 interview.

**C.      The Effect of the Error**

{52}      The conclusion of error does not end the inquiry here, however, because as the State rightly points out, the improper admission need not be grounds for a new trial unless the error was harmful to Defendant.  For a non-structural, constitutional error as has been established here, the State bears the burden of proving beyond a reasonable doubt that the error was harmless to the outcome.  *See, e.g.*, *State v. Tollardo*, 2012-NMSC-008, ¶ 25, 275 P.3d 110.   A critical inquiry in the determination of whether a given error is harmless is the question of whether the error "was likely to have affected the jury's verdict."  *Id.* ¶ 42.  We examine all the circumstances surrounding the error; examine the importance to the prosecution's case of the erroneously admitted evidence, and ask, among other things, whether the erroneously admitted evidence was cumulative or introduced new facts.  *Id.* ¶ 43.  In the end, we must satisfy ourselves that the " 'guilty verdict actually rendered in *this* trial was surely unattributable to the error,' " *id.* ¶ 44 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)),  or alternatively, that there was no "reasonable possibility" the error contributed to Defendant's conviction. *Tollardo*, 2012-NMSC-008, ¶ 57.

{53}    The effect of admission of the August 6 statements here was exceedingly minimal.  The State's theory at trial emphasized Defendant's willful and deliberate activity and posited that he had acted largely alone—in much the same way he had explained in his earlier August 1 interview with Eubank.  Defendant's August 6 statements contradicted that account, suggesting his will may have been overborne by, and he may have acted in concert with, others directing the conduct.  Defendant's presentation at trial was much more closely aligned with the account he gave on August 6, and it is unclear how, based on the rest of the record, his presentation might have changed in the absence of the August 6 statements.  The error here, in other words, was likely not cumulative, but may have constituted a rare case of introduction of facts favorable to *Defendant*.  But based on the convictions, it appears the jury found Defendant's August 1 version of events more credible than his August 6 version; and in the absence of the August 6 version, the record does not reveal much else of significance with which Defendant might have undermined the August 1 account.

{54}    Accordingly, based on the record, there was no reasonable possibility the admission of the August 6 statements contributed to Defendant's convictions, and therefore the district court's erroneous admission of the statements was harmless.

# IV. CONCLUSION

{55} Defendant has not established a prima facie case that his counsel was ineffective for failing to move to suppress statements Defendant made in his August 1 interview with Eubank. The district court erred, however, in admitting statements from Defendant's August 6 interview—at that point, Defendant's Sixth Amendment right to counsel had attached, and because he was a juvenile, the right could not have been validly waived in the absence of counsel. But that error was harmless because there was no reasonable possibility the admission contributed to Defendant's convictions. We affirm Defendant's convictions and sentence.

{56} **IT IS SO ORDERED.**


_____
**PETRA JIMENEZ MAES, Justice**


**WE CONCUR:**


_____
**EDWARD L. CHÁVEZ, Justice**

36

_____
**CHARLES W. DANIELS, Justice**


_____
**BARBARA J. VIGIL, Justice**


**JUDITH K. NAKAMURA, Chief Justice, specially concurring**

37

**NAKAMURA, Justice (specially concurring).**

{57} I concur with the overall result reached by the majority; Defendant's convictions should be affirmed. I do not, however, join in all portions of the majority opinion. This case can be resolved on narrower grounds and, thus, should be. *See Schlieter v. Carlos*, 1989-NMSC-037, ¶ 13, 108 N.M. 507, 775 P.2d 709 ("It is an enduring principle of constitutional jurisprudence that courts will avoid deciding constitutional questions unless required to do so. We have repeatedly declined to decide constitutional questions unless necessary to the disposition of the case."); *Baca v. N.M. Dep't of Pub. Safety*, 2002-NMSC-017, ¶ 12, 132 N.M. 282, 47 P.3d 441 (noting that courts exercise judicial restraint by deciding cases on the narrowest possible grounds and avoid reaching unnecessary constitutional issues); *see also Harmon v. Brucker*, 355 U.S. 579, 581 (1958) ("In keeping with our duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case, we look first to petitioners' nonconstitutional claim . . . ."); *United States v. Allen*, 406 F.3d 940, 946 (8th Cir. 2005) ("When we are confronted with several possible grounds for deciding a case, any of which would lead to the same result, we choose the narrowest ground in order to avoid unnecessary adjudication of constitutional issues."); *Bellville v. Town of Northboro*, 375 F.3d 25, 30 (1st Cir.

38

2004) ("Normally, we endeavor to avoid deciding constitutional issues and attempt to decide cases on the narrowest grounds possible."); *Korioth v. Brisco*, 523 F.2d 1271, 1275 (5th Cir. 1975) ("Cases are to be decided on the narrowest legal grounds available . . . .").

{58} The district court denied Defendant's motion to suppress because it was untimely. This determination is a complete and sufficient basis for denying the motion. *See State v. Vialpando*, 1979-NMCA-083, ¶ 6, 93 N.M. 289, 599 P.2d 1086 (failing to file a motion to suppress within the time frame required by our rules of criminal procedure provides sufficient grounds to deny the motion); *State v. Helker*, 1975-NMCA-141, ¶ 7, 88 N.M. 650, 545 P.2d 1028 ("[W]e hold that rules of criminal procedure can put a time limitation on the exercise of a constitutionally protected right."); *see also City of Santa Fe v. Marquez*, 2012-NMSC-031, ¶ 28, 285 P.3d 637 ("Rule 5-212(C) requires that motions to suppress be filed before trial and that the district courts must adjudicate suppression issues before trial, absent good cause."). The district court's untimeliness ruling was an appropriate application of the law to the facts. *See State v. Gutierrez*, 2005-NMCA-015, ¶ 9, 136 N.M. 779, 105 P.3d 332 ("The denial of a motion to suppress requires us to determine if the law was correctly applied to the facts.").

{59} The former version of Rule 5-212(C) NMRA (2012), applicable here, provides as follows: "A motion to suppress shall be made within twenty (20) days after the entry of a plea, unless, upon good cause shown, the trial court waives the time requirement of this rule." Defendant entered a not guilty plea in district court on December 19, 2011. *Maj. Op.* ¶¶ 13, 15. Defendant filed his motion to suppress 353 days later, on December 6, 2012, only four days before trial. *Maj. Op.* ¶ 19. Defendant did not comply with the time for filing requirement. Even under the present iteration of the rule, Defendant's motion was significantly late. *See* Rule 5-212(C) NMRA ("A motion to suppress shall be filed no less than sixty (60) days prior to trial, unless, upon good cause shown, the trial court waives the time requirement.").

{60} The district court did not find that good cause existed to excuse the untimely filing. As the ensuing discussion shows, this ruling was not an abuse of discretion. *See State v. Smallwood*, 2007-NMSC-005, ¶ 12, 141 N.M. 178, 152 P.3d 821 (explaining that the Court would review the district court's determination of whether a party had shown good cause to waive a time requirement under another rule for abuse of discretion).

{61} At the hearing on Defendant's suppression motion—which occurred on the opening day of trial—defense counsel conceded that there was no good explanation for why he and Defendant's previously appointed attorneys failed to comply with the time for filing requirement of Rule 5-212(C). The State rightly protested that this explanation was patently insufficient, emphasized that Defendant knew of the existence of the potential Sixth Amendment violation by at least the date of the preliminary hearing on November 17, 2011, and suggested that it was plausible Defendant purposefully delayed filing the suppression motion for strategic purposes. The State's arguments are persuasive.

{62} The record does in fact reflect that Defendant knew of the suppression issue as early as the preliminary hearing. At that hearing, Defendant established that Detective Eubank had some awareness that counsel had been appointed to represent Defendant by the time of the second interview on August 6, 2011, but, despite this awareness, Detective Eubank did not attempt to ascertain the identity of appointed counsel or to contact that individual before interviewing Defendant on August 6, 2011. We can only guess why Defendant did not file his motion to suppress at or around the time of the preliminary hearing and why he waited over a year to file it. It is clear, however, that clients are bound by the acts of their attorneys. *See State v.*

41

*Serros*, 2016-NMSC-008, ¶ 46, 366 P.3d 1121 ("[A]ctions of defense counsel ordinarily are attributable to the defendant.").

{63}     Our Rules of Criminal Procedure are intended to promote basic fairness in the administration of justice. *See* Rule 5-101(B) NMRA ("These rules . . . shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay."). Waiting until the eve of trial to file a significant suppression motion implicating difficult questions of constitutional law is not, by any measure, "fair." The State had only a few short days to respond to Defendant's motion, and foisting difficult legal questions on an adversary on the very eve of trial bears all the marks of improper gamesmanship. It is impossible, of course, to say whether defense counsel was engaged in such conduct here. The point is simply that the Rules of Criminal Procedure exist to eliminate the possibility for gamesmanship and ensure an even playing field, and it is essential that the parties comply with them. Moreover, district courts must ensure parties comply with our Rules of Criminal Procedure and impose meaningful consequences when the rules are not followed so as to promote the efficient and effective administration of justice. *Cf. State v. Le Mier*, 2017-NMSC-017, ¶ 18, ___ P.3d ___. ("[T]rial courts shoulder the significant and important responsibility of ensuring the efficient administration of

42

justice in the matters over which they preside, and it is our obligation to support them in fulfilling this responsibility.").

{64} In his briefing to this Court, Defendant's appellate counsel contends that the untimely filing was the product of ineffective assistance of counsel and that this deficiency constitutes the good cause necessary to excuse the untimely filing. I cannot agree for the following two reasons.

{65} First, the statements elicited from Defendant at the second interview tended to exonerate Defendant and shift primary responsibility for the killing to others. *Maj. Op.* ¶ 52. Thus, it is unclear whether a competent attorney would want the statements suppressed, and it is equally unclear whether defense counsel's failure to move to suppress the statements even constitutes ineffective assistance of counsel. *See generally State v. Bernal*, 2006-NMSC-050, ¶ 32, 140 N.M. 644, 146 P.3d 289 (alteration in original) ("Trial counsel is generally presumed to have provided adequate assistance. An error only occurs if representation [falls] below an objective standard of reasonableness. If any claimed error can be justified as a trial tactic or strategy, then the error will not be unreasonable." (internal quotation marks and citations omitted)). Second, to accept the contention that attorney incompetence constitutes good cause to excuse a defendant from complying with the time for filing

43

requirement of Rule 5-212(C) would effectively nullify the requirement rendering it nothing more than a meaningless aspiration. "I just couldn't do it" is not an acceptable excuse for missing a filing deadline and the district court did not commit error or abuse its discretion in rejecting this explanation as good cause.

{66} The district court's decision to deny Defendant's suppression motion because it was not timely filed should be affirmed. This conclusion should end the analysis in Section III B of the majority opinion. The harmless error analysis in Section III C, while correct, is unnecessary. I concur that Defendant's convictions should be affirmed.

_____
**JUDITH K. NAKAMURA, Chief Justice**