## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2020-NMSC-007

Filing Date: March 19, 2020

No. S-1-SC-36966

**STATE OF NEW MEXICO,**

     Plaintiff-Petitioner,

v.

**RONALD WIDMER,**

     Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Stan Whitaker, District Judge**

Released for Publication May 5, 2020.

Hector H. Balderas, Attorney General
John Kloss, Assistant Attorney General
Santa Fe, NM

for Petitioner

Bennett J. Baur, Chief Public Defender
C. David Henderson, Appellate Defender
Santa Fe, NM

for Respondent

## OPINION

**THOMSON, Justice.**

**{1}** This appeal requires us to determine whether an officer's question was sufficiently related to protecting officer safety to qualify for the public safety exception to the admissibility requirements of *Miranda* announced in *New York v. Quarles*, 467 U.S. 649, 655-56 (1984). The Court of Appeals determined that the question in this case did not qualify for the *Quarles* public safety exception. *State v. Widmer*, 2018-NMCA-035, ¶ 29, 419 P.3d 714. The Court of Appeals consequently reversed Defendant Ronald Widmer's conviction for possession of methamphetamine and remanded for a new trial.

*Id.* ¶¶ 1, 40. We respectfully disagree and affirm the ruling of the district court that the *Quarles* public safety exception applied in this case because of the need to determine whether Defendant was armed or carrying potentially harmful drug paraphernalia before officers performed a pat-down search. We therefore reverse the Court of Appeals on its disqualification of the public safety exception and remand for further proceedings consistent with this opinion.

## I.      BACKGROUND

**{2}**     Officers from the Albuquerque Police Department (APD) approached Defendant in a Walgreens parking lot in the late evening. Defendant, accompanied by a woman, was trying to start a motor scooter. APD had received an anonymous tip concerning two persons and a scooter with an ignition that "appeared to be tampered with." The officers suspected that the scooter was stolen. After briefly speaking with Defendant and the woman, officers ran Defendant's personal identification information and the scooter's vehicle identification number (VIN) through the National Crime Information Center (NCIC) to check for outstanding warrants and any stolen vehicle reports. NCIC did not return a stolen vehicle report but did report Defendant's outstanding felony warrants for trafficking drugs. Officers placed Defendant in handcuffs while they awaited confirmation that the warrants were valid.

**{3}**     While Defendant was in custody, but before he was advised of his *Miranda* rights, an officer asked him, "Is there anything on your person that I should know about?" Defendant responded, "I have meth." Officers collected a white powder from inside a pill container hanging from Defendant's belt loop and placed it in a plastic evidence bag. After officers recovered the physical evidence, Defendant muttered, "Well, I'm gonna have another charge now." The white powder recovered from Defendant's belt loop tested positive for methamphetamine. As a result, Defendant was charged with felony possession of a controlled substance.

**{4}**     Defendant asked the district court to suppress both his "alleged" statement to officers concerning "meth" and the physical evidence, arguing that the officer's question following arrest did not qualify under the narrow public safety exception to *Miranda*. The district court denied Defendant's motion but instructed the jury to determine whether the "statement allegedly made by the defendant . . . was given voluntarily" before considering it in deliberations. *See* UJI 14-5040 NMRA. The jury found Defendant guilty of possession of methamphetamine.

**{5}**     Defendant appealed his conviction for possessing methamphetamine. The Court of Appeals reversed his conviction and held that the statement and the physical evidence should have been suppressed. *Widmer*, 2018-NMCA-035, ¶¶ 29-30. The Court of Appeals remanded for a new trial because it held that the erroneously admitted evidence was not harmless error, *id.* ¶¶ 38-40, and therefore declined to address the merits of other issues Defendant raised, *see id.* ¶ 40. We granted certiorari.

## II.     DISCUSSION

**{6}**     The Court of Appeals majority did not address the issue Defendant raised concerning the lawfulness of his arrest. *Id.* Because that issue was not presented to this Court in the State's petition for writ of certiorari, we do not determine whether Defendant's arrest was lawful. *See State v. Morales*, 2010-NMSC-026, ¶ 19, 148 N.M. 305, 236 P.3d 24 ("Under the appellate rules, it is improper for this Court to consider any questions except those set forth in the petition for certiorari." (internal quotation marks and citation omitted)); *see also* Rule 12-502(C)(2)(b) NMRA ("[T]he Court will consider only the questions set forth in the petition."). We turn to the issue of whether the district court erred by admitting the incriminating statement officers elicited from Defendant based on the *Quarles* public safety exception to *Miranda*.

**{7}**     Because the officers chose not to take the short, simple step of advising Defendant of his constitutional rights, we must determine whether Defendant was subjected to a custodial interrogation, and if so, whether there was an exception to *Miranda* that renders his statements admissible. If a defendant is subject to custodial interrogation but not advised of his rights under *Miranda*, the law generally requires that the defendant's response be suppressed. *See Quarles*, 467 U.S. at 654 ("The *Miranda* Court, however, presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights." (footnote omitted)). However, suppression of a defendant's statements or responses to an unadvised custodial interrogation is not required if the *Quarles* public safety exception applies. *See id.* 467 U.S. at 655 ("[T]here is a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence.").

**{8}**     Although we determine that Defendant was subjected to a custodial interrogation, we respectfully disagree with the Court of Appeals reasoning concerning the application of the *Quarles* public safety exception in this case. Because we conclude that the *Quarles* exception applies, we reverse on this issue, vacate the Court of Appeals opinion, and remand for further proceedings consistent with this opinion. We specifically instruct the Court of Appeals to address Defendant's argument concerning the lawfulness of his arrest, as it appears to be relevant to the remaining analysis. *See, e.g.*, *State v. Almanzar*, 2014-NMSC-001, ¶ 10, 316 P.3d 183 ("If [a d]efendant's arrest was lawful, then the search incident to the arrest falls within the exception to the constitutional search warrant requirement."); *State v. Ruffino*, 1980-NMSC-072, ¶ 3, 94 N.M. 500, 612 P.2d 1311 (observing that "search incident to a lawful arrest" is one of the recognized exceptions that permit warrantless searches).

**{9}**     The minority, citing *Quarles*, would hold that although Defendant was in custody, "questions designed to protect public safety" are exempt from the definition of interrogation. *See Min. Op.* ¶¶ 47-58. We disagree. By exempting questions designed to protect public safety, *Quarles* did not redefine what constitutes interrogation. Instead, *Quarles* determined that exigent circumstances may justify an exception to *Miranda* and permit a court to admit a defendant's self-incriminating statements regardless of whether the defendant was subjected to custodial interrogation. *Quarles*, 467 U.S. at

655-56, 658. *Quarles* specifically observed, "The New York Court of Appeals was undoubtedly correct in deciding that the facts of this case come within the ambit of the *Miranda* decision as we have subsequently interpreted it." 467 U.S. at 655-56. However, *Quarles* recognized "a narrow exception to the *Miranda* rule . . . [that] will be circumscribed by the exigency which justifies it." *Id.* at 658.

**{10}**    If questions designed to protect public safety were never interrogation, there would be no reason for *Quarles* to create an exception to the requirements of *Miranda*. We choose to remain faithful to the Fifth Amendment and the *Quarles* analysis. Defendant was subjected to a custodial interrogation, but the *Quarles* public safety exception applied. The district court did not err by admitting Defendant's statement in this case.

## A.     Standard of Review

**{11}**     "Appellate review of a district court's decision regarding a motion to suppress evidence involves mixed questions of fact and law." *State v. Urioste*, 2002-NMSC-023, ¶ 6, 132 N.M. 592, 52 P.3d 964. "The trial court's denial of a motion to suppress will not be disturbed on appeal if it is supported by substantial evidence, unless it also appears that the determination was incorrectly premised." *State v. Jacobs*, 2000-NMSC-026, ¶ 34, 129 N.M. 448, 10 P.3d 127; *accord State v. Trangucci*, 1990-NMCA-009, ¶ 13, 110 N.M. 385, 796 P.2d 606. This Court reviews the application of the law de novo but views the evidence in the light most favorable to the state. *State v. Ochoa*, 2004-NMSC-023, ¶ 5, 135 N.M. 781, 93 P.3d 1286. "Whether facts support an exception to the *Miranda* requirement is a question of law." *United States v. Lackey*, 334 F.3d 1224, 1226 (10th Cir. 2003).

## B.     The Officer's Question Subjected Defendant to Custodial Interrogation

**{12}**     "Prior to any [custodial interrogation, a] person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). This Court has stated, "The federal and state constitutional provisions [protect] against self-incrimination and require, at a minimum, that before any individual may be subjected to custodial interrogation, the individual must be made aware of various rights the courts have established to aid in protecting the right to be free from self-incrimination." *State v. Rivas*, 2017-NMSC-022, ¶ 27, 398 P.3d 299; *see generally Miranda*, 384 U.S. at 478-79. If a defendant is subjected to custodial interrogation without being advised of the right to remain silent, a presumption of coercion arises. *See United States v. Patane*, 542 U.S. 630, 631 (2004) ("[T]he *Miranda* rule creates a presumption of coercion in custodial interrogations, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief.").

**{13}**    However, the *Miranda* rule is "only applicable when (1) the suspect is in 'custody,' and (2) any 'questioning [] meet[s] the legal definition of interrogation.'" *United*

*States v. Cash*, 733 F.3d 1264, 1276-77 (10th Cir. 2013) (alterations in original) (quoting *United States v. Benard*, 680 F.3d 1206, 1211 (10th Cir. 2012)). Neither party disputes, and there is no question, that Defendant was in custody when he was questioned, so what we must determine is whether he was interrogated.

**{14}** "'[I]nterrogation' refers to 'either express questioning or its functional equivalent'—i.e., 'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Cash*, 733 F.3d at 1277 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). For the reasons that follow, we determine that the officer's question constituted interrogation.

**1.      The officer's question was not normally attendant to arrest and custody**

**{15}** Officers received notification through NCIC that there were two outstanding felony warrants for Defendant's arrest, and they initiated arrest procedures while they confirmed the warrants.

**{16}** As part of the arrest procedures preceding the physical search, the officers put on protective gloves, and Officer Apodaca asked Defendant, "Is there anything on your person that I should know about?" Officer Apodaca testified that he asked Defendant "as a courtesy" because Officer Apodaca was going to search Defendant. Officer Apodaca also testified that he was concerned that a needle or other sharp object in Defendant's possession might injure and expose him to bodily fluids or other hazardous materials during the physical search.

**{17}** The State argues that the officer's question was "normally attendant to arrest and custody." This argument is consistent with officer testimony that the question is "routine[ly]" asked of a person the officer is preparing to search and handcuff, "for [officer] safety, as well as the safety of the defendant." Although we agree that "[n]ot every sentence punctuated by a question mark constitutes an interrogation," *Cash*, 733 F.3d at 1277, we disagree with the State's view of the officer's inquiry given the facts of this case.

**{18}** Even when a suspect is in custody, not all police questioning constitutes interrogation for purposes of *Miranda*. "[Q]uestions such as 'what is your name?' and 'where do you live?' will not usually constitute interrogation within the meaning of *Miranda*." *United States v. Edwards*, 885 F.2d 377, 385 (7th Cir. 1989). These questions are constitutionally permissible because "police routinely ask people for their names and addresses in nonarrest situations—in order to ascertain the identity and residence of witnesses, as well as to dispel (or confirm) suspicions aroused by unusual behavior—where it is clear that *Miranda* warnings are not required." *Id.* (citing *California v. Byers*, 402 U.S. 424 (1971)).

**{19}** Limited police questioning focused on procedural matters is not interrogation if the questions are not directed at obtaining evidence of a crime. In *Pennsylvania v.*

*Muniz*, the United States Supreme Court concluded that "limited and carefully worded inquiries as to whether [the defendant] understood" instructions on how to perform a sobriety test were "necessarily 'attendant to' the police procedure held by the court to be legitimate." 496 U.S. 582, 603-04 (1990).

**{20}** We emphasize that the context matters for purposes of determining whether police have subjected a suspect to interrogation without warning. "There is a routine booking question exception to the *Miranda* rule that covers a person's name, address, height, weight, eye color, date of birth, and current age." *United States v. Virgen-Moreno*, 265 F.3d 276, 293 (5th Cir. 2001). "Nevertheless, questions designed to elicit incriminatory admissions are not covered under the routine booking exception." *Id.*

**{21}** An officer is not permitted to transform a question that constitutes interrogation into a question normally attendant to arrest and custody by simply making it a policy to ask specific questions during the process of custody or arrest. *See Muniz*, 496 U.S. at 602 n.14 ("'[T]he police may not ask questions, even during booking, that are *designed* to elicit incriminatory admissions.'" (emphasis added) (citation omitted)). Such a "question-first" strategy is constitutionally repugnant because it undermines the policy established by *Miranda* to safeguard a defendant's Fifth Amendment protection against self-incrimination. *See Missouri v. Seibert*, 542 U.S. 600, 611 (2004) ("The object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed."). The minority analysis would produce the same result for which the State essentially advocates, the adoption of a policy that would permit a question-first strategy so long as the officer did not subjectively seek to elicit incriminatory admissions. We will not condone such conduct.

**{22}** The question in this case was not normally attendant to arrest and custody. "Is there anything on your person that I should know about?" was not asked for identification purposes and was not narrowly focused on police procedure. It was much broader than the officer's limited inquiries in *Muniz* directed at the defendant's understanding of the instructions for the sobriety test. Though the State argues that officers routinely ask this question when initiating an arrest and search of a suspect, our inquiry cannot end there. *See Muniz*, 496 U.S. at 602 n.14. ("'[R]ecognizing a 'booking exception' to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception.'" (citation omitted)). Seemingly innocuous questions that call for an incriminating response may not be normally attendant to arrest and custody when viewed in context. We must consider the context of the questioning and the content of the question to determine whether the question was reasonably likely to elicit an incriminating response.

### 2. The officer's question was reasonably likely to elicit an incriminating response

**{23}** "Interrogation occurs when an officer subjects an individual to questioning or circumstances which the officer knows or should know are reasonably likely to elicit

incriminating responses." *State v. Fekete*, 1995-NMSC-049, ¶ 41, 120 N.M. 290, 901 P.2d 708 (internal quotation marks and citation omitted). The officer's subjective intent (e.g., concern for the officer's own safety) is not determinative because this "is an 'objective [inquiry,] . . . and we focus on the perceptions of a reasonable person in the suspect's position rather than the intent of the investigating officer.'" *United States v. Yepa*, 862 F.3d 1252, 1257 (10th Cir. 2017) (alteration and omission in original) (quoting *Cash*, 733 F.3d at 1277).

**{24}** Questions directed at establishing an element of a crime constitute interrogation because they are "reasonably likely to elicit an incriminating response." *See United States v. Disla*, 805 F.2d 1340, 1347 (9th Cir. 1986). In *Disla*, officers discovered cocaine and cash in an apartment and developed a suspicion that the defendant resided there when they observed him approaching the apartment building. *Id.* Based on "both the context of the questioning and the content of the question," the Ninth Circuit concluded that the defendant was subjected to interrogation, because "the question as to where [the defendant] lived was related to an element (possession) of the crime." *Id.*

**{25}** Similarly, in *United States v. Perdue*, the Tenth Circuit concluded that the question "'What stuff?'" was interrogation when officers, with guns drawn, detained an arrestee who was lying on the ground upon order of the officers. 8 F.3d 1455, 1458-59, 1465 (10th Cir. 1993). The arrestee replied, "'The marijuana that I know you guys found in the shed.'" *Id.* at 1459. In *Harryman v. Estelle*, the Fifth Circuit concluded that an arrestee was subjected to interrogation when an officer, aware of drug paraphernalia found in the arrestee's motel room, asked "'What is this?'" when he found a condom containing white powder in the arrestee's waistband. 616 F.2d 870, 873 (5th Cir. 1980). The arrestee responded, "'Oh, you know what it is. It is heroin.'" *Id.* The instant case is analogous to these two cases because the officer's question in each of the three was reasonably likely to elicit an incriminating statement establishing knowledge or possession of drugs.

**{26}** The State argues that the question was not reasonably likely to elicit an incriminating response because the question was not "part of any investigation into whether [Defendant] possessed a controlled substance." Again the State's argument advocates for this Court to abandon the objective test and construct a subjective test based on the subjective belief or intent of the officer who "*could not have known* [the question] was reasonably likely to elicit an incriminating response . . . ." (Emphasis added.) We see no reason to change the inquiry to incorporate a subjective standard. As we have previously stated, the test is objective. *State v. Fekete*, 1995-NMSC-049, ¶ 41. Defendant correctly pointed out at oral argument that if an arrestee possesses contraband or other evidence on the arrestee's person and an officer asks the arrestee, "Do you have anything else on you that I should know about?", not only is the question reasonably likely to elicit an incriminating response, but the response is necessarily incriminating if the arrestee is truthful.

**{27}** The minority asserts, "Federal case law confirms that questions falling within the public safety exception do not and cannot constitute interrogation." *Min. Op.* ¶ 57 (citing as examples *United States v. Reyes*, 353 F.3d 148, 154 (2d Cir. 2003); *United States v. DeSantis*, 870 F.2d 536, 541 (9th Cir. 1989); and *Lackey*, 334 F.3d at 1228). The minority fails to appreciate that exempting public safety questions from the definition of interrogation would nullify the requirement that exigent circumstances justify suspending the requirements *Miranda* imposes. *Quarles*, 467 U.S. at 658 (stating that "in each case" the exception "will be circumscribed by the exigency which justifies it"). Instead, the minority would hold that any question that could be related to officer or public safety could never compel an incriminating statement. Federal precedent, including the precedent cited by the minority, does not grant law enforcement such broad latitude and sweeping authority. *See Quarles*, 467 U.S. at 655, 658 (holding that even though a defendant was subjected to custodial interrogations "there is a 'public safety' exception to the requirement that *Miranda* warnings be given" that must be justified by exigent circumstances).

**{28}** For example, *Reyes* acknowledged the legal determination of the federal government that "the officer's questioning constituted interrogation within the meaning of *Miranda*." 353 F.3d at 151. In that case, the "sole contention [was] that the statements should have been admitted under the 'public safety exception' to the *Miranda* rule." *Id. Reyes*, 353 F.3d at 154, applied the policy determination announced in *Quarles* that where law enforcement asks a question that is "necessary to secure [officers'] safety or the safety of the public" and "*not solely* to elicit testimonial evidence from a suspect," courts may admit a defendant's response. *Quarles*, 467 U.S. at 658-59 (emphasis added).

**{29}** *DeSantis* observed, "The *Quarles* decision does not warrant the conclusion that the 'public safety' exception allows the police to obtain involuntary, or coerced, statements in exigent circumstances." *DeSantis*, 870 F.2d at 540. In adopting a public policy suspending the Fifth Amendment protections against compelling a "person . . . to be a witness against himself," the United States Supreme Court in *Quarles* "recognize[d] that certain exigencies required the courts to relax rules that act as prophylactic safeguards of the right against compelled self-incrimination." *DeSantis*, 870 F.2d at 540. Under the totality of the circumstances, the question, "whether there were any weapons in the bedroom," was incriminating, but an officer had given DeSantis his *Miranda* warnings, and the question was not asked solely to elicit testimonial evidence. *Id.* at 537, 539, 541.

**{30}** Finally, *Lackey* does not analyze interrogation. *See Lackey*, 334 F.3d at 1226-28. *Lackey* necessarily assumed that the defendant was subjected to custodial interrogation and held that "the reasoning of *Quarles* applies squarely to the circumstances here" and "[t]he exception [to *Miranda*] undoubtedly extends to officers' questions necessary to secure their own safety." *Id.* at 1227-28 (internal quotation marks and citation omitted). The minority reliance appears to rest on dicta, which postulates that the physical evidence is the actual source of incrimination, not the defendant's incriminating statement. *Id.* at 1228 (observing that if the search is incident to a lawful arrest, "officers

have the right to, and will, search the person of an arrestee"). This reasoning fails to appreciate that both the statement and the physical evidence are incriminating and further assumes that there is a lawful arrest.

**{31}** We appreciate that the district court found that exigent circumstances and concern for officer safety justified the question in this case, and we agree that *Quarles* applied in this case. However, this Court's determination, affirming the district court, does not require us to alter, and arguably eviscerate, the definition of interrogation formulated by *Innis*. Defendant was subjected to a question concerning his knowledge of possible contraband that he possessed, an element directly related to his possession charge. A reasonable person under these circumstances who was in possession of contraband would have perceived three options: lie, say nothing, or tell the incriminating truth. Given these options, the officer's question in this case reflects "a measure of compulsion above and beyond that inherent in custody" because "the police should know [the question is] reasonably likely to elicit an incriminating response from" Defendant. *Innis*, 446 U.S. at 300-01.

**{32}** The *Innis* Court observed, "Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect." *Id.* at 302 n.8. Because officers knew they were arresting Defendant on felony warrants, and because officers knew they were going to search for and find any contraband on Defendant's person, the question was tantamount to a demand that Defendant tell the incriminating truth. *See State v. Ybarra*, 1990-NMSC-109, ¶ 15, 111 N.M. 234, 804 P.2d 1053 (determining that interrogation occurred where officers "took advantage" of compelling circumstances that resulted in an arrestee's incriminating statements even though the officers did not create the circumstances).

**{33}** The *Widmer* majority adopted the reasoning of the Washington Court of Appeals in *State v. Spotted Elk*, 34 P.3d 906 (Wash. Ct. App. 2001), as part of its interrogation analysis. *Widmer*, 2018-NMCA-035, ¶¶ 20-21. Our analysis does not rely on *Spotted Elk* because it can be read to suggest a shift in the interrogation analysis away from an objective test (focused on the perceptions of a reasonable person in the suspect's position) toward a subjective test (improperly based on the subjective belief or intent of the officer), which we reject. Reliance on *Spotted Elk* is not required to reach the conclusion that we share with the Court of Appeals that Defendant was subjected to custodial interrogation.

**{34}** Based on the foregoing, Defendant was subjected to custodial interrogation, and his right to be instructed under *Miranda* attached.

## C. The *Quarles* Exception to *Miranda* Applies in This Case

**{35}** Although we determine that Defendant's *Miranda* rights attached, we conclude that the *Quarles* public safety exception applies in this case because the question was

not asked solely to elicit incriminating testimony. The potential for Defendant having objects on his person that threatened officer safety "outweigh[ed] the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Quarles*, 467 U.S. at 657 (concluding that the need for answers may outweigh the prophylactic rule).

**{36}** In *Quarles*, a woman approached two officers on patrol, told them that a man with a gun had just raped her, and gave them a description of the man. *Id.* at 651-52. She also told the officers that the man had entered a nearby supermarket. *Id.* The officers entered the supermarket and spotted the suspect, who attempted to escape. *Id.* at 652. Officers lost sight of the suspect momentarily but apprehended him before he could exit the supermarket. *Id.* When officers searched the suspect, they noticed that he was wearing an empty shoulder holster and asked where the gun was. *Id.* The suspect nodded in the direction of the gun and responded, "The gun is over there." *Id. Quarles* announced a safety exception to the prophylactic requirements of *Miranda* and indicated that it covered public safety and police safety concerns. *Id.* at 658-69 ("We think police officers can and will distinguish almost instinctively between questions necessary to secure *their own safety or the safety of the public* and questions designed solely to elicit testimonial evidence." (emphasis added)).

**{37}** *Quarles* applies in a situation where the potential threat is to an officer's safety. *See Trangucci*, 1990-NMCA-009, ¶¶ 11-12 ("The [United States] Supreme Court has clearly included considerations of police safety within the purview of the public safety exception."). In *Trangucci*, the Court of Appeals held that the *Quarles* exception distinguishes between questions that are clearly investigatory and those that are objectively reasonable based on a need to protect "from [an] immediate danger." *Trangucci*, 1990-NMCA-009, ¶ 11 (internal quotation marks and citation omitted). The application of the *Quarles* exception does not turn on whether the risk is to the safety of the general public or only police officers. *Trangucci*, 1990-NMCA-009, ¶ 11; *accord Lackey*, 334 F.3d at 1225-26, 1228 (applying *Quarles* where an officer asked a handcuffed defendant, before a pat down search, if the defendant had any guns or sharp objects on him, and the defendant responded that he did not but said that there was a gun in the car). The *Trangucci* court affirmed the denial of a motion to suppress a defendant's statement that he had ditched a gun in response to the question "'Where is the gun?'" *Id.* ¶¶ 5, 13. The defendant made the statement while being searched, after officers pulled the defendant out from under a dresser in a motel room before they located the gun that the defendant was suspected of using. *Id.* ¶¶ 3-5.

**{38}** In this case, the fact that the question did not use terms such as "sharp objects" or "weapons" specifically does not bar the application of the *Quarles* safety exception. We acknowledge that the officer's questioning was not ideal, and as Defendant points out, the answer to any question asked concerning what Defendant had on his person was potentially incriminating. But "[t]his type of question is logical and important to permit" because in addition to concerns about weapons a suspect could use against an officer during a search, "sharp and bio-hazardous objects pose a great risk to officers

regardless of any action by the suspect." *United States v. Hernandez*, 751 F.3d 538, 541 (7th Cir. 2014).

**{39}**   An officer should not be expected to craft a perfect question in the heat of the moment, and a broad question that may elicit information other than specific safety concerns does not bar the application of the *Quarles* exception. *See United States v. Williams,* 181 F.3d 945, 953 n.13 (8th Cir. 1999) ("[C]onditioning admissibility of evidence under the public safety exception on an officer's ability to ask questions in a specific form would run counter to the *Quarles* Court's decision that an officer may forgo announcement of *Miranda* warnings when public safety is threatened."); *see also United States v. Estrada,* 430 F.3d 606, 612 (2nd Cir. 2005) ("Thus, a question that plainly encompasses safety concerns, but is broad enough to elicit other information, does not necessarily prevent application of the public safety exception when safety is at issue and context makes clear that the question primarily involves safety."). Here, as the Court of Appeals minority opinion points out, the district court determined that in conjunction with his search, the officer donned protective "gloves as one precaution against the possibility of sharp objects such as needles." *Widmer*, 2018-NMCA-035, ¶ 45 (Hanisee, J., dissenting). The question was a second precaution. We conclude that the officer limited the inquiry to items on Defendant's person including potentially hazardous items that could affect officer safety. Thus, we affirm the district court's determination that the *Quarles* exception applies.

**{40}**   This Court acknowledges that reasonable people may disagree. In support of suppressing the physical evidence, the *Widmer* majority concluded that the "'narrow'" public safety exception did not apply and that the question must be "focused . . . [and] necessary to ensure the safety of the officer when there is an objective, immediate threat to the safety of the officer." *Widmer*, 2018-NMCA-035, ¶¶ 29-30. Respectfully, this Court believes that the better application of the public safety exception aligns with those courts that do not apply such a narrow reading of the *Quarles* exception.

**D.   We Vacate the Court of Appeals Opinion and Remand for Further Proceedings**

**{41}**   Officers subjected Defendant to custodial interrogation, and *Miranda* warnings generally would be required. *See State v. Nieto*, 2000-NMSC-031, ¶ 20, 129 N.M. 688, 12 P.3d 442 (observing that a suspect's *Miranda* rights attach when the suspect is subjected to custodial interrogation). However, in this case, the *Quarles* exception lifted the prophylactic rule requiring *Miranda* warnings. *Trangucci*, 1990-NMCA-009, ¶ 12 (observing that officer safety is encompassed within the public safety exception). The district court did not err in admitting Defendant's statement, "I have meth." We therefore do not reach the Court of Appeals determination that the physical evidence should have been suppressed as fruit of the poisonous tree subsequent to a *Miranda* violation because the *Quarles* public safety exception permitted the interrogation at issue.

**{42}**   Based on our holding, we are not required to and do not reach the question whether the Court of Appeals properly applied the fruit of the poisonous tree doctrine to

suppress the physical evidence. We simply note that federal case law may not support such an application of the doctrine. *See Quarles*, 467 U.S. at 659-60 (admitting both the defendant's response to an officer's question asked before giving *Miranda* warnings and the physical evidence); *see also id.* at 667-72 (O'Connor, J., concurring in the judgment in part and dissenting in part) (reasoning that suppression of the physical evidence is not proper and observing that "whatever case can be made for suppression [of statements made during custodial interrogation without Fifth Amendment instruction] evaporates when the statements themselves are not admitted").

{43}    As the ultimate arbiter of the New Mexico Constitution, it is our duty to observe that Defendant failed to raise and argue whether the fruit of the poisonous tree doctrine should apply to physical evidence discovered subsequent to a violation of the right to instruction under Article II, Section 15 of the New Mexico Constitution. *See State v. Gomez*, 1997-NMSC-006, ¶¶ 22-23, 122 N.M. 777, 932 P.2d 1 (providing guidance on the interstitial approach and preservation of questions when broader protection may be available under the state constitution). As former Associate Justice William J. Brennan, Jr., of the United States Supreme Court wrote:

> [D]ecisions of the [United States Supreme] Court are not, and should not be, dispositive of questions regarding rights guaranteed by counterpart provisions of state law. Accordingly, such decisions are not mechanically applicable to state law issues, and state court judges and the members of the bar seriously err if they so treat them.

Brennan, William J., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 502 (1977) (footnote omitted). We agree that the dual nature of our federalism requires robust scrutiny of constitutional decisions of federal courts by state courts *and* scrutiny of "state-granted rights that state courts can safeguard," *id.* at 502-03, and so remind practioners to raise state constitutional issues where appropriate.

## III.    CONCLUSION

{44}    For the foregoing reasons, we conclude that the *Quarles* public safety exception applied to the officer's question in this case. Accordingly, we vacate the Court of Appeals opinion and remand to the Court of Appeals for further proceedings consistent with this opinion.

**{45}    IT IS SO ORDERED.**

**DAVID K. THOMSON, Justice**

**WE CONCUR:**

**BARBARA J. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**JAMES T. MARTIN, Judge,**

**Sitting by designation**

**NAKAMURA, Chief Justice (concurring in part, dissenting in part).**

**{46}**     First, while I concur that the question Officer Apodaca asked Widmer falls within the public safety exception identified in *Quarles* and agree that it does so for the reasons articulated in the majority opinion, s*ee Maj. Op.* ¶¶ 38-39, I do not concur that the question constitutes "interrogation" as that term is used in *Miranda*. *Maj. Op.* ¶ 34. If the question Officer Apodaca asked Widmer falls within the public safety exception, it cannot be interrogation.  Second, the majority has not given adequate deference to the district court's assessment of the facts.  Rather, the majority applied the law to the facts as it found them.  The Court of Appeals' majority similarly did not defer to the district court about fact matters and incorrectly embraced facts and inferences in direct opposition to the district court's resolution of this case.  *See Widmer*, 2018-NMCA-035, ¶ 29.

## I.     PUBLIC SAFETY EXCEPTION AND INTERROGATION

**{47}**     If we ask what the public safety exception *is an exception to*, the answer is that it is an exception to the requirement that police must Mirandize criminal suspects before asking them certain questions, i.e., those focused on public safety.  *Quarles* expressly holds that police officers need not Mirandize an accused before asking questions designed to protect public safety.  467 U.S. at 655-56.  The basic thought at work here is that *Miranda* is not concerned with and has no effect on questions designed to secure public safety.  *Id.* at 656-58.  At the core of this thought is a policy choice: The United States Supreme Court decided that the Fifth Amendment shall not operate in such a way that it jeopardizes public safety.  *Id.* at 657-58.

**{48}**     Secondary authorities uniformly confirm what is apparent from the language of *Quarles* itself: the public safety exception is an exception to "the requirement *that Miranda warnings be given*."  2 Wayne R. LaFave et al., *Criminal Procedure*, § 6.7(b), at 859 (4th ed. 2015) (emphasis added) (quoting *Quarles*, 467 U.S. at 655); 2 Joseph G. Cook, *Constitutional Rights of the Accused*, § 6:33, at 6-220 (3d ed. 1996) (stating that *Quarles* "recognized a public safety exception to the requirement of *Miranda* warnings"); 3 Nancy Hollander et. al., *Wharton's Criminal Procedure*, § 19:8, at 19-33-35 (14th ed. 2017) (observing that *Quarles* created a public safety exception to the requirement that *Miranda* warnings be given); 4 Mark S. Rhodes, *Orfield's Criminal Procedure Under the Federal Rules*, § 26:507, at 171-72 n.15 (2d ed. 1987) (observing that *Quarles* created a "[p]ublic safety exception to the *Miranda* warning requirement"); 2 David S. Rudstein et al., *Criminal Constitutional Law*, § 4.02A, at 4-98 (Matthew Bender 2019) ("So long as the officers ask questions that are reasonably prompted by a concern for the public safety, *Miranda* warnings are not required." (internal quotation marks and citation omitted)).

**{49}** Because the public safety exception is an exception to the requirement that *Miranda* warnings be given at all, questions permissibly and properly asked for public safety cannot constitute interrogation as understood by *Miranda*. If this were not so and properly posed public safety questions could constitute "interrogation," then such questions posed to a suspect in custody could produce a *Miranda* violation. Indeed, the majority in this case holds that Widmer was in custody and subject to interrogation such that his *Miranda* right "attached." *Maj. Op.* ¶ 34. In subsequent paragraphs, the majority writes that "the *Quarles* exception lifted the prophylactic rule requiring *Miranda* warnings." *Maj. Op.* ¶ 41. They conclude that "suppression of a defendant's statements or responses . . . is not required if the *Quarles* public safety exception applies." *Maj. Op.* ¶ 7. This is incorrect.

**{50}** The focus of the *Quarles* exception is not suppression. *Quarles* eliminates the requirement that *Miranda* warnings be given. Thus, the majority does not properly conceptualize how the *Quarles* exception functions.

**{51}** Unfortunately, our case law also has not correctly grasped the effect of the public safety exception as it is described in *Quarles*. In *State v. Cooper*, this Court explained that "[u]nder certain circumstances, such as the 'public safety' exception recognized in . . . *Quarles*, 467 U.S. [at] 655-60 . . . a statement taken in violation of *Miranda* may be admissible." 1997-NMSC-058, ¶ 41, 124 N.M. 277, 949 P.2d 660. *Cooper* misstates the law. Proper public safety questions cannot violate *Miranda* because there is no requirement to Mirandize the accused before asking proper public safety questions.

**{52}** The cases and treatises discussing *Quarles* and how the public safety exception was incorporated into Fifth Amendment doctrine do not describe the exception as "lifting" an "attached" right. As noted, those authorities uniformly indicate that *Miranda* has no effect on an officer's authority to ask public safety questions. The basic point here is that no right "attaches" when these questions are asked and, thus, *Quarles* does not "lift" that right or eliminate the need for suppression. Put most simply, a thing not subject to a term can never be construed as violating that term.

**{53}** Having said all of this, it is still possible to ask why it must be true that properly posed public safety questions cannot constitute interrogation. The answer to this question is that proper public safety questions are not designed to elicit incriminating statements.

**{54}** Consider *Quarles*. There can be no doubt that when Mr. Quarles was asked "Where is the gun?" his decision to supply an answer was damning. After all, he was charged with criminal possession of a weapon. *Quarles*, 467 U.S. at 651. The question "Where is the gun?" was undoubtedly a form of direct-police questioning bearing on an element of the crime with which Mr. Quarles was charged. Justice Marshall made this very point in his dissent and claimed that the majority's approach effectively eviscerated *Miranda*. *See, e.g., id.* at 675 (Marshall, J., dissenting). In the end, however, it appears it did not matter to the majority that the question asked was a form of direct questioning bearing on an element of Mr. Quarles' crime. The Court decided that the Fifth

Amendment could not be construed in such a way that it jeopardized public safety and, therefore, it was not necessary to Mirandize Mr. Quarles before asking him "Where is the gun?" Despite Marshall's protest, this was not some momentous departure from an unbending principle.

{55}   It is settled that "[n]ot all express questioning by the police is considered interrogation under *Miranda* and *Innis*." Rudstein, *supra*, § 4.02[3][b], at 4-60. Routine booking questions are not interrogation. *Id.* Similarly, "[r]outine questions asked at bail hearings are generally not viewed as 'interrogation.'" Hollander, *supra*, § 19:8, at 19-30-31. "General background questions such as name, address, age, and occupation are not usually viewed as interrogation . . . ." Cook, *supra*, § 6:32, at 6-200-01. "Requesting a driver's license or other permit is not considered interrogation[.]" *Id.* at 6-206. "Conversations where the defendant responds to being informed about the charge have been held not to constitute interrogation." Rudstein, *supra*, § 4.02[3][b], at 4-63. Asking a defendant to perform field sobriety tests is not interrogation even if the physical and verbal responses the defendant gives incriminate him. LaFave, *supra*, § 6.7(c), at 875. If the reader has detected a pattern this is the intended effect. The *Quarles* public safety exception identifies a type of police questioning that is also not interrogation.

{56}   This point is most obvious given *Quarles*' observations that "police officers can and will distinguish almost instinctively between [1] questions necessary to secure their own safety or the safety of the public and [2] questions designed solely to elicit testimonial evidence from a suspect." 467 U.S. at 658-59. The clear implication of this observation is that questions posed for public safety are not designed to elicit incriminating statements from a suspect.

{57}   Federal case law confirms that questions falling within the public safety exception do not and cannot constitute interrogation. *See, e.g.*, *Reyes*, 353 F.3d at 154 ("We are likewise persuaded that the arresting officer's questions were sufficiently limited in scope and were not posed to elicit incriminating evidence. . . . The questions that the officer asked Reyes concerned the presence of dangerous objects on Reyes' person." (citations omitted)); *DeSantis*, 870 F.2d at 541 ("Viewing the totality of the circumstances in the present case, the inspectors cannot be said to have coerced DeSantis into revealing that there was a gun in the bedroom. . . . [V]iewed objectively, Martino's question was not intended to elicit testimonial evidence, but rather to secure the inspectors' own protection."); *Lackey*, 334 F.3d at 1228 ("The purpose of the question 'Do you have any guns or sharp objects on you?' is not to acquire incriminating evidence; it is solely to protect the officers, as well as the arrestee, from physical injury. Thus, in this context requiring *Miranda* warnings does precious little to protect the arrestee's privilege against self-incrimination." (emphasis omitted)).

{58}   The validity of the view that public safety questions are not interrogation is also apparent given the clear inconsistency in the majority opinion. The majority cannot simultaneously hold that the question Officer Apodaca asked Widmer was "limited . . . to items on [Widmer's] person including potentially hazardous items that could affect officer safety" and hold that Officer Apodaca's question was "reasonably likely to elicit

[from Widmer] an incriminating statement establishing knowledge or possession of drugs." *Compare Maj. Op.* ¶ 39 *with id.* ¶ 25. Officer Apodaca's question was either asked for his safety or it was asked to elicit an incriminating response from Widmer. It cannot be for both. And what is most troublesome about this inconsistency is that, in the wake of this opinion, officers will be unable to discern what, exactly, they can and cannot permissibly ask an arrestee before searching them. Officers may feel obligated to jeopardize their own safety for concern that a safety question might be deemed constitutionally inappropriate interrogation.

## II.     THE DISTRICT COURT'S FACTUAL DETERMINATIONS

**{59}**    The majority correctly determines as a matter of law that the question Officer Apodaca asked Widmer cannot be categorically excluded as a permissible public safety question merely because the question was poorly worded. *Maj. Op.* ¶¶ 38-40. The majority also correctly concludes as a matter of law that the officers' concerns with protecting themselves from "weapons" or "sharp and bio-hazardous objects" potentially within an arrestee's clothes or on their body is a safety concern *Quarles* was certainly meant to address. *Maj. Op.* ¶ 38. What is absent from the majority's analysis, however, is how the district court's findings, and the inferences supporting those findings factor into its resolution of this case.

**{60}**    The facts are undisputed. Officer Apodaca stated that, immediately prior to asking Widmer whether he had anything on his person Officer Apodaca needed to know about, both officers were in the process of donning protective gloves. Officer Apodaca explained that they don these gloves when searching arrestees to protect themselves from any unknown and potentially dangerous items arrestees might have in their pockets or otherwise on their person. The district court must have credited this testimony when it decided that the question Officer Apodaca asked was asked "for the purpose of finding out whether or not there were weapons on [Widmer] or something that could harm [the officers]."

**{61}**    This fact determination necessarily required the district court to assess the credibility of the two officers, to evaluate the coherence of their explanation as to why they did what they did, and to bring to bear normative considerations about what constitutes appropriate police conduct given the community in which these events transpired. Of course, the district court could have resolved this matter in favor of Widmer. It could have decided, as a fact matter, that the question Officer Apodaca asked was not asked for legitimate safety concerns but was an attempt, or ruse, to elicit an incriminating response. It did not.

**{62}**    The question we must ask and answer on appeal is whether the district court correctly applied the law to the facts *as it found them*. There is undoubtedly overlap between the fact determinations the district court made and the legal questions we must ask and answer on appeal, but this overlap does not make the district court's factual determinations irrelevant. In fact, the district court's fact determinations are all but dispositive in this case.

**{63}** The twin legal conclusions that officers are not expected to ask perfect questions and that they are justified in asking arrestees whether they have weapons or other dangerous items in their clothing or on their persons are common sense conclusions that are neither novel nor controversial. This case really turns on the fact that the district court believed the officers and the explanations they provided for their conduct.

**{64}** Attention must be given to the district court's factual determinations for an additional reason. The Court of Appeals' majority opinion claims that "[t]he officers expressed no concern of any kind" that their interactions with Widmer "posed a danger to their safety." *Widmer*, 2018-NMCA-035, ¶ 29. The Court of Appeals went on to state that Officer Apodaca "did not say" that Widmer might have something on his person that could harm Officer Apodaca. *Id.* This is not a fair account of the officers' testimony.

**{65}** Officer Apodaca testified that officers routinely ask the individuals they search if they might encounter dangerous objects during the search. This concern is self-evidently reasonable. It is impossible to foresee what members of our society might be carrying in the pockets of their clothing. It is even less clear what the individuals police officers routinely interact with—those involved in the drug trade or who have committed crimes—might have in their pockets. Officer Apodaca was not expected to know with certainty what was in Widmer's pockets before asking him questions designed to ensure Officer Apodaca did not harm himself during the search. To expect otherwise is unreasonable.

**{66}** For all of these reasons, I respectfully dissent in part.

**JUDITH K. NAKAMURA, Chief Justice**