**PUBLISH**

**F I L E D**
**JUL 11 2003**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RODGERICK LABON LACKEY, aka
Roderick Lackey,

Defendant-Appellant.

No. 02-1255

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 01-CR-210-WM)**

Madeline S. Cohen, Assistant Federal Public Defender (Michael G. Katz, Federal
Public Defender, with her on the briefs), Denver, Colorado, for Defendant-
Appellant.

Martha Ann Paluch, Assistant United States Attorney (John W. Suthers,
United States Attorney, and William L. Taylor, Assistant United States Attorney,
with her on the brief), Denver, Colorado, for Plaintiff-Appellee.

Before **HARTZ** and **McKAY** , Circuit Judges, and **BRORBY** , Senior Circuit
Judge.

**HARTZ** , Circuit Judge.

Defendant Rodgerick Labon Lackey appeals his conviction after trial for possession of a firearm by a restricted person, in violation of 18 U.S.C. § 922(g)(1). His sole issue on appeal concerns the denial of his motion to suppress the firearm. He argues that police officers discovered the firearm through an interrogation that violated *Miranda v. Arizona*, 384 U.S. 436 (1966). After Defendant's arrest on a warrant, but prior to his receiving *Miranda* warnings, officers asked him whether he had any guns or sharp objects on him. He responded that there was a gun in the car he had just left. We affirm Defendant's conviction, holding that officers about to conduct a lawful frisk or search of a suspect need not give *Miranda* warnings before asking the suspect about the presence of dangerous objects on his person.

## I. Factual Background

The relevant facts are not in dispute. On May 16, 2001, a woman contacted the Colorado Springs Police Department (CSPD) to report that a man had fired shots at her house. After some preliminary investigation, the police presented the woman with a photo array, from which she identified Defendant. The CSPD obtained a state arrest warrant for Defendant on felony charges of illegal discharge of a firearm, menacing with a handgun, and possession of a weapon by a previously convicted felon. The CSPD then contacted an agent of the federal

Bureau of Alcohol, Tobacco, and Firearms (ATF) to obtain assistance in apprehending Defendant.

On May 23 two CSPD officers and the ATF agent went to the parking lot of an apartment building where Defendant was believed to be living, hoping to arrest him as he arrived at or left the building. Shortly thereafter, the three officers saw a man resembling Defendant approach a car matching the description of Defendant's car. The man opened the car's hatchback and spent about a minute moving things around inside the car.

The officers approached the man, displayed their badges, and identified themselves. The man took a few steps away from the hatchback. One officer asked him his name, and Defendant identified himself. Defendant was told that he was under arrest on an outstanding warrant. Next, an officer asked Defendant, "Do you have anything on you that would hurt me?" R, Vol. 5, at 47, 88. Defendant responded, "What is this about? What is this about?" *Id.* at 44, 88. An officer replied, "I will tell you about it in a minute," and then handcuffed Defendant. *Id.*

Once Defendant was handcuffed, but before he was patted down, an officer asked, "Do you have any guns or sharp objects on you?" Defendant responded, "No, I don't have anything on me, but there was a gun in the car." *Id*. at 47-48, 89. The officers looked into the car's open hatchback and noticed a gun and its

magazine clip, both plainly visible. When an officer asked Defendant whether the car was his, Defendant responded that it belonged to him and his wife. At the officers' request he granted consent to search the car. He then was frisked, but no additional weapons were discovered.

Following the arrest, Defendant was transported to the ATF office, where he received *Miranda* warnings for the first time. Defendant signed a written waiver and gave a written statement denying his involvement in the May 16 shooting.

Defendant was later charged with possession of a firearm by a restricted person, in violation of 18 U.S.C. § 922(g)(1). He filed motions to suppress the gun and the statements he made to the police officers at the arrest scene. The district court denied the motions to suppress, finding that the officers' questions about whether Defendant had weapons or sharp objects on him were within the public-safety exception to the *Miranda* requirement, *see New York v. Quarles*, 467 U.S. 649 (1984). The court also concluded that Defendant had voluntarily consented to the search of the car, and that the search of the car was proper as a search incident to a lawful arrest.

Defendant's case proceeded to trial, where he was found guilty. This appeal followed. We have jurisdiction under 28 U.S.C. § 1291.

## II. Discussion

Whether facts support an exception to the *Miranda* requirement is a question of law. Because Defendant "challenges the district court's ultimate ruling, not its underlying findings, . . . our review is *de novo*." *United States v. Humphrey*, 208 F.3d 1190, 1201 (10th Cir. 2000).

The sole issue on appeal is whether the officers violated Defendant's constitutional rights by asking him about the presence of guns or sharp objects on his person after he was in custody but before he was informed of his *Miranda* rights. Agreeing with the other circuit courts to address the issue, we hold that the question was proper under the public-safety exception to *Miranda* set forth in *Quarles*. *See United States v. Padilla*, 819 F.2d 952, 960-61 (10th Cir. 1987) (applying *Quarles* to question of arrestee about the condition of persons inside a house he had been shooting at).

In *Quarles* two police officers encountered a woman who informed them that she had just been raped. 467 U.S. at 651-52. She told the officers that the rapist had a gun and had recently entered a nearby grocery store. *Id.* The officers entered the store, where they spotted a man matching the suspect's description. *Id.* at 652. Upon seeing the officers, the suspect fled. *Id.* After giving pursuit, one of the officers, Frank Kraft, cornered the suspect and ordered him to stop and put up his hands. *Id.* Officer Kraft frisked him, at which time he discovered that

the suspect was wearing an empty shoulder holster. *Id.* Officer Kraft handcuffed the suspect and asked him where the gun was. *Id.* The suspect nodded to some empty cartons and stated "the gun is over there." *Id.* Officer Kraft proceeded to the cartons, where he discovered a loaded .38 caliber pistol. *Id.* Officer Kraft then formally placed the suspect under arrest and advised him of his *Miranda* rights. *Id.*

The state trial court suppressed the suspect's statement that "the gun is over there," ruling that it was obtained by a question improperly asked before the suspect was informed of his *Miranda* rights. *Id.* at 652-53. The New York Court of Appeals affirmed. After concluding that the suspect had been in "custody" within the meaning of *Miranda,* it "declined to recognize an exigency exception to the usual requirements of *Miranda* because it found no indication from Officer Kraft's testimony at the suppression hearing that his subjective motivation in asking the question was to protect his own safety or the safety of the public." *Id.* at 653.

The Supreme Court reversed, holding that "on these facts there is a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence." *Id.* at 655. Observing that "[u]ndoubtedly most police officers, if placed in Officer Kraft's position, would act out of a host of different, instinctive, and largely unverifiable motives—their

own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect," *id.* at 656, the Court said that "the availability of that exception does not depend upon the motivation of the individual officers involved." *Id.*

The Court reasoned that the protection of the Fifth Amendment privilege provided by *Miranda* could not justify the risk to public safety. It wrote:

> In such a situation, if the police are required to recite the familiar *Miranda* warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost. Here, had *Miranda* warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

> We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination.

*Id.* at 657.

Although the Court noted that the public-safety exception could theoretically diminish the clarity of *Miranda*, it minimized this concern, stating, "We think police officers can and will distinguish almost instinctively between

-7-

questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." *Id.* at 658-59.

In our view, the reasoning of *Quarles* applies squarely to the circumstances here. The focused question of the officers—"Do you have any guns or sharp objects *on you*"—addressed a real and substantial risk to the safety of the officers and Defendant: If Defendant was carrying such an item, he could use it against the officers or, perhaps more likely, someone could be seriously injured when Defendant, who was already under arrest, was routinely searched or frisked.

It is irrelevant that the principal danger in this case was the risk of injury to the officers or Defendant himself, rather than ordinary members of the "public." As the above-quoted passages from *Quarles* illustrate, the concern of the public-safety doctrine extends beyond safety to civilians. The exception undoubtedly extends to officers' "questions necessary to secure their own safety." *Id.* at 659; *cf. United States v. Holt*, 264 F.3d 1215, 1221-26 (10th Cir. 2001) (en banc) (concerns about officer safety justify routinely asking about presence of weapons during traffic stop).

Indeed, in one significant respect an exception to *Miranda* can be better justified in this case than in *Quarles*. Here, a responsive answer to the officers' question would not, as a practical matter, incriminate a suspect. Because officers

have the right to, and will, search the person of an arrestee, they will learn soon enough whether the arrestee is carrying a dangerous object. The purpose of the question "Do you have any guns or sharp objects on you?" is not to acquire incriminating evidence; it is solely to protect the officers, as well as the arrestee, from physical injury. Thus, in this context requiring *Miranda* warnings does precious little to protect the arrestee's privilege against self-*incrimination*. The risk of incrimination is limited to non-responsive answers (such as in this case, when the suspect provides more information than requested), not a risk particularly worthy of a prophylactic rule. *Cf. Rhode Island v. Innis*, 446 U.S. 291, 302-03 (1980) (*Miranda* inapplicable when suspect's incriminating comments came in response to officers' statements that could not have reasonably been expected to elicit an incriminating response).

We note that in similar circumstances other circuit courts have held that the public-safety exception applies. *See United States v. Shea*, 150 F.3d 44, 48 (1st Cir. 1998) (pre-*Miranda* question asking arrested defendant whether he had any weapons fell within the public-safety exception); *United States v. Young*, No. 02-4465, 2003 WL 283189, at \*1 (4th Cir. Feb. 11, 2003) (unpublished) (officer's pre-*Miranda* question, "do you have any sharp objects, knives, needles, or guns," was within public-safety exception); *United States v. Webster*, 162 F.3d 308, 332 (5th Cir. 1998) ("[T]he police acted constitutionally when they asked [the

defendant] whether he had any needles in his pockets that could injure them during their pat down; such questioning, needed to protect the officers, does not constitute interrogation under *Miranda*."); *United States v. Edwards*, 885 F.2d 377, 384 (7th Cir. 1989) (public-safety exception applied to pre-*Miranda* question asking arrested defendant whether he had a gun); *United States v. Carrillo*, 16 F.3d 1046, 1049-50 (9th Cir. 1994) (pre-*Miranda* question asking arrested defendant whether he had any needles on him was within the public-safety exception).

The judgment of the district court is AFFIRMED.