2025 UT App 67

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
NOAH EROL MILLETT,
Appellant.

Opinion
No. 20230449-CA
Filed May 15, 2025

Sixth District Court, Richfield Department
The Honorable Marvin D. Bagley
No. 191600014

K. Andrew Fitzgerald, Attorney for Appellant

Derek E. Brown and Jeffrey D. Mann,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1 A jury convicted Noah Erol Millett of several crimes—the most serious of which was possession of a firearm by a restricted person—related to events that took place in connection with a traffic stop. He appeals his convictions, challenging several decisions the trial court made during the course of his case. He asserts that the court erred in denying his motion to suppress evidence found in his vehicle. He takes issue with the jury selection process, including the court's decision to deny some of his for-cause objections to individual jurors. He challenges the court's decision to admit certain toxicology evidence. He assigns error to the court's decision to deny his motion for a directed verdict on a drug paraphernalia charge. And he faults the court

for proceeding with the trial during his own short voluntary absence from the proceedings. For the reasons discussed, we reject Millett's arguments and affirm his convictions.

BACKGROUND[1]

¶2     One day, an officer (Officer) was on patrol when he saw Millett driving a car. Officer recognized Millett from previous interactions and recalled that Millett's driver license had been suspended. After running a records check to confirm that Millett's license was indeed suspended, Officer activated his emergency lights and initiated a traffic stop. Officer approached the vehicle and began conversing with Millett about the status of his license; Millett indicated that he thought the license issue had already been "cleared up." A female passenger was present in the car; Millett identified her as his girlfriend (Girlfriend), and he explained to Officer that Girlfriend was in the late stages of pregnancy. After conversing briefly with Millett and Girlfriend, Officer returned to his vehicle to conduct a second records check on Millett and an initial records check on Girlfriend; this check revealed that Girlfriend had an outstanding arrest warrant. Upon returning to Millett's car, Officer informed Millett and Girlfriend that Girlfriend had a warrant. Millett, who by this point had exited the vehicle and was "standing behind" it, approached Officer "[i]n an aggressive manner."

¶3     When Millett began acting aggressively, Officer and at least two other law enforcement officers who had arrived on the

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Popp*, 2019 UT App 173, n.1, 453 P.3d 657 (cleaned up).

scene "grabbed" Millett and "tried to put him in handcuffs." Millett "started to resist," however, and the officers eventually had to wrestle him to the ground. During the scuffle, Millett told the officers that it was "not going to end well" if they attempted to arrest Girlfriend. After the officers subdued Millett, but before they frisked him, one of the other officers (Detective) asked, "Do you have any weapons on you?," to which Millett responded that his "9-millimeter pistol" was "under the seat" of the car. Detective then asked, "Do you have any drugs, no needles, nothing on you?," to which Millett replied that "there [were] needles in the door" of the car. At that point, one of the officers looked under the driver's seat of the car and located a loaded handgun. Millett was later arrested because of his "interference" with officers; Girlfriend—because of her pregnancy—was not formally arrested, but she was "detained" to "take care of the warrant." Both Millett and Girlfriend were then transported to the county jail "without further incident."

¶4    The officers decided to impound the vehicle, and as part of the impound process, they performed an inventory search. In addition to the handgun, officers discovered, in the driver's side door, two used syringes, a bag of unused syringes, a baggie "containing a clear liquid substance," and a "clear container with a black lid or a cap." A field test on residue found in the container and the baggie was positive for methamphetamine; the results of that field test were later confirmed via a lab test. In addition, officers obtained a sample of Millett's blood, which also tested positive for methamphetamine.

¶5    After investigation, the State eventually charged Millett with possession of a firearm by a restricted person, possession or use of a controlled substance, interference with an arresting officer, possession of drug paraphernalia, and driving with a measurable controlled substance in the body.

¶6 Later, Millett filed a motion to suppress, asking the court "for an order suppressing any and all evidence obtained as a result of the warrantless search of [his] vehicle." In relevant part, the motion asserted that "[t]he initial 'traffic stop' was illegal" because Officer "did not confirm" that Millett's license was suspended "prior to his initiation of the traffic stop." Thus, Millett argued, "[t]he pre-arrest search of [his] vehicle was illegal" because the search was not "supported by probable cause" or, in the alternative, because any probable cause was "developed by questioning [Millett] while he was on the ground in handcuffs" and before he had been provided with the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966). The State opposed Millett's motion, asserting that the officers did have probable cause and, alternatively, that the items in the vehicle would have inevitably been discovered anyway after officers arrested or detained Millett and Girlfriend and impounded the vehicle.

¶7 The court issued a written ruling denying Millett's motion. In the ruling, the court referenced "a dash video that shows the arrest," and it found that, in the video, "[a]n officer can be heard asking [Millett] if he had any weapons 'on him,' to which [Millett] replied that there was 'a gun under the seat.'" The court also found that the "officer asked [Millett] if he had any drugs or needles on him, to which [Millett] initially said no, then add[ed] 'there's needles in the door.'" The court also found that the State had "showed by a preponderance of the evidence that both [Millett] and [Girlfriend] would have been arrested even if the vehicle had not been searched," due to Millett "resisting arrest" and because Girlfriend had an outstanding warrant. The court concluded that, because Officer had confirmed Millett's identity and suspended license before initiating the stop, there "was sufficient reasonable suspicion for Officer . . . to initiate the traffic stop." The court also determined that the items recovered from the car would have been inevitably discovered when officers,

after arresting Millett and Girlfriend and impounding the vehicle, conducted a lawful inventory search.

¶8 The case then proceeded to a two-day jury trial. The court summoned twenty-eight potential jurors and, of those, seven were excused prior to trial and five did not show up on the day of trial. This left just sixteen potential jurors available at the beginning of jury selection from which to empanel a jury of eight. But neither party asked the court to postpone or continue the trial because of the limited number of available jurors.

¶9 Millett's attorney (Counsel) did, however, ask the trial court to strike five of the potential jurors for cause. The State did not oppose Millett's request with regard to two of those jurors, but it did oppose Millett's request as to the other three. After additional questioning of the three contested jurors, all of them indicated that, despite some level of acquaintance with some of the State's witnesses or with one of the prosecutors, they could nevertheless be fair and impartial. On that basis, the court denied Millett's motion regarding the three contested jurors, concluding that "[a]ll three answered pretty directly that they could be fair and impartial" and were thus "adequately rehabilitated." Due to the limited number of jurors, the State "volunteered to only exercise two peremptory challenges instead of four," but Millett remained entitled to all four of his peremptory challenges. Millett used a peremptory strike on one of the three contested jurors; the other two were seated and participated in the trial.

¶10 During the trial, the State called several witnesses in support of its case-in-chief, including Officer, Detective, and the toxicologist (Scientist) who tested Millett's blood sample. Officer and Detective both testified about the events described above.

¶11 Scientist testified that, once Millett's blood sample was received by her laboratory, another toxicologist likely "performed a screening test" but that she could not "be sure" "without having

more data." She explained that when the lab receives a sample, one of the toxicologists typically "perform[s] a series of screening analyses first, . . . then another toxicologist will perform the confirmation test." Scientist explained that she did not perform preliminary screening tests on Millett's sample but that she did perform the confirmation test. When asked by the State if the preliminary test "affect[s] the . . . . integrity and the reliability of the test [Scientist] performed herself," Scientist answered, "No, it does not." Scientist also confirmed that the testing "machines [are] checked regularly" and that the "machine was operating correctly" on the day Scientist ran Millett's confirmation test. Scientist did not, however, assert that she had personally calibrated the machine.

¶12    When the State attempted to ask Scientist about the result of the confirmation test, Millett objected on several grounds, two of which are relevant here. First, Millett objected because Scientist "didn't testify whether or not she specifically was the one that calibrated the machine." And second, Millett objected because the State had not called as a witness the other toxicologist who had performed the preliminary screening test, and Millett asserted that he had "a right to confront . . . [the] expert [that] did the first test." The State responded by stating that it was "not trying to introduce evidence of the preliminary test" and was "only introducing the confirmation [test] which is what [Scientist] did." The court overruled the objections, concluding that Scientist's testimony about calibration and testing was sufficient. The court also offered its view that any concerns Millett had about the tests pertained to the weight of the evidence rather than its admissibility. Following the court's ruling, Scientist testified that Millett's blood sample tested positive for methamphetamine.

¶13    After the State rested its case, Millett made—as relevant here—a motion for directed verdict on the drug paraphernalia charge, asserting that the State's evidence on that count was insufficient because the State hadn't "presented enough

evidence" to meet its burden of showing that Millett had "an intent to possess" the paraphernalia. The court denied the motion.

¶14    When it was his turn to present evidence, Millett called his father (Father) as a witness. Father testified that he owned the car Millett had been driving on the day of the incident. Father also stated that the gun found in the car was his and that Millett had given him the gun several years earlier as "a gift" to "cheer [Father] up" after his wife, Millett's mother, had passed away. Father stated, however, that the gun remained registered in Millett's name because Father "didn't do the paperwork" to register the gun in his name. Father claimed that, although he normally stored the gun "locked up in [a] gun cabinet," he had decided to keep it in his car for protection after being "intimidated" by individuals at a gas station. Father indicated that he had never told Millett, or anyone else, that he had placed the gun in the car. Father stated that the day in question was the first time that Millett had borrowed the car, but that a woman who had been staying at Father's house had used the car "occasionally" in the weeks prior to the incident. Father testified that the woman was no longer living at his house, that she left "under rather angry conditions," and that, thereafter, Father found "two hypodermic needles" "in the nightstand" in her room.

¶15    From the record, it appears that Millett and Counsel had some ongoing disagreements about how the case should be tried. On the second day of trial, Millett and Counsel met with the court for an in-chambers discussion about Millett's "disagreement with many of the strategies [Counsel was] using in the trial." When back on the record, Counsel stated that Millett's ongoing "disagreement" with him was "making it difficult for [Counsel] to concentrate on [his] strategy." The court indicated that, in its view, Millett was "being well represented," but nonetheless noted that Millett did have the right to represent himself if he should so choose. Millett chose to proceed with Counsel. Shortly thereafter, the court ruled on a motion to dismiss that Counsel had filed, in

which he asserted that the case should be dismissed because Millett had not been given a speedy trial, in part due to the COVID-19 pandemic. The court acknowledged that Millett's case had been pending for "a long time," but it noted that, despite disruptions from the pandemic, "most of [the continuances] were initiated by [Millett's] side." Accordingly, the court found that "there was not prejudice to [Millett]" and denied the motion.

¶16 Millett was apparently dissatisfied with Counsel's motion to dismiss, however, because soon after the court denied the motion, Millett told the court—outside the presence of the jury—that he "had a written motion" that he wanted the court to address. Millett then asked to "be excused" from the courtroom in order to retrieve the motion, to which the court responded that Millett could "get it at lunchtime." The court also told Millett that if he chose to leave the courtroom to retrieve the motion, the trial would "go[] forward" in his absence and that it would not "look good" for him, but that it was his "choice." Millett ultimately chose to leave the courtroom, and the court did indeed proceed in his absence. When the jury re-entered the courtroom, the court gave an instruction that the jury "should draw no inferences from" Millett's absence, that "[h]e is still presumed innocent," and that the jury "should give it no weight that" Millett was not there. After a brief absence, Millett logged onto the trial court's videoconference service to listen to the proceedings. And at some point later that same morning, Millett returned to the courtroom in person and remained until the trial concluded.

¶17 After deliberation, the jury found Millett guilty on all charges. The court sentenced Millett to prison, but it suspended that sentence and placed Millett on probation, with conditions.

ISSUES AND STANDARDS OF REVIEW

¶18　Millett now appeals, and he presents five issues for our review. First, he challenges the trial court's ruling denying his motion to suppress. "A trial court's decision to grant or deny a motion to suppress . . . is a mixed question of law and fact. Factual findings are reviewed for clear error, but legal conclusions are reviewed for correctness." *State v. Evans*, 2021 UT 63, ¶ 20, 500 P.3d 811 (cleaned up).

¶19　Second, Millett takes issue with the jury selection process, asserting that the court should have continued the trial due to the small number of available jurors, and taking issue with the court's decision to overrule his for-cause objections to three of the potential jurors. As we explain below, Millett failed to preserve any argument that the court should have continued the trial. And we review for "abuse of discretion" a "trial court's determination of whether to excuse a prospective juror for cause." *State v. Ellis*, 2020 UT App 119, ¶ 10, 473 P.3d 211 (cleaned up).

¶20　Third, Millett challenges the court's decision to allow Scientist to offer testimony about the results of the testing she performed on Millett's blood; he asserts that this was error because he was not able to confront the other toxicologist who performed the preliminary screening tests. "We review a trial court's evidentiary rulings for an abuse of discretion, and we will not reverse the trial court's ruling on evidentiary issues unless it is manifest that the trial court so abused its discretion that there is a likelihood that injustice resulted." *State v. Gollaher*, 2020 UT App 131, ¶ 21, 474 P.3d 1018 (cleaned up).

¶21　Fourth, Millett takes issue with the court's ruling denying his directed verdict motion on the drug paraphernalia charge. "We review [a trial] court's denial of a motion for directed verdict for correctness." *State v. Graydon*, 2023 UT App 4, ¶ 26, 524 P.3d 1034 (cleaned up). In particular, "when a defendant challenges the

denial of a motion for a directed verdict based on the sufficiency of the evidence, the applicable standard of review is highly deferential, and we will uphold the [trial] court's denial if, when viewed in the light most favorable to the State, some evidence exists from which the elements of the crime could be proven beyond a reasonable doubt." *Id.* (cleaned up).

¶22    Finally, Millett challenges the court's decision to proceed with the trial during Millett's absence from the courtroom. This challenge presents "a mixed question of law and fact. The initial question—whether the trial court's inquiry regarding the voluntariness of a defendant's absence was properly conducted—is a question of law reviewed for correctness. If the first question is answered in the affirmative, we next consider whether [the defendant] was voluntarily absent, a question of fact." *State v. Pando*, 2005 UT App 384, ¶ 13, 122 P.3d 672 (cleaned up).

ANALYSIS

I.  Motion to Suppress

¶23    Millett first asserts that the court improperly denied his motion to suppress the evidence discovered in the vehicle (the gun, the drugs, and the paraphernalia). In particular, Millett argues that any probable cause that the officers might have had regarding the presence of a gun and drugs in the vehicle was "developed by subjecting Millett to unlawful custodial interrogation" prior to providing him the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶24    The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "To protect this right against self-incrimination, the United States Supreme Court held, in *Miranda* . . . , that individuals who are in police

custody must be apprised of their rights prior to any questioning—including the right to remain silent and the right to the presence of an attorney." *State v. Schaefer*, 2025 UT App 4, ¶ 13, 563 P.3d 424 (cleaned up), *petition for cert. filed*, Mar. 13, 2025 (No. 20250261). Generally, the remedy for a *Miranda* violation is suppression of incriminating evidence obtained as a result of that violation. *Id.* ¶ 28 (determining that a *Miranda* violation occurred and remanding for a new trial "in which the incriminating statements made during [the defendant's] custodial interrogation must be suppressed").

¶25 Millett argues that the trial court improperly denied his motion to suppress because the statements the officers obtained from him regarding the presence of a gun and drugs in the vehicle were obtained before any *Miranda* warnings were given and after he was in custody. But even if we assume—without deciding—that Millett was in custody at the time he provided that information, there is no *Miranda* violation here because the officers' questions were permissible pursuant to the public safety exception. *See New York v. Quarles*, 467 U.S. 649, 655 (1984).

¶26 In *Quarles*, the United States Supreme Court established "a 'public safety' exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence." *Id.* In that case, the court determined that an officer's question to an individual about the whereabouts of a gun that had been stashed in a supermarket did not violate *Miranda*, reasoning that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 655–57.

¶27 The public safety exception is applicable here. As noted, Millett had been acting aggressively toward the officers and was in the process of being restrained. Girlfriend, who was in the late stages of pregnancy, was present and unrestrained. Officers were

also preparing to frisk Millett after placing him in handcuffs. In this situation, the officers were—due to concern for the safety of themselves and the public—permitted to ask Millett whether he had weapons or needles "on him." And they were permitted to do so even before apprising Millett of his *Miranda* rights. *See, e.g., United States v. Lester*, 98 F.4th 768, 772, 774–75 (6th Cir. 2024) (holding that the public safety exception applied when the officer, before patting down a suspect, asked whether there was "anything else on you, any other drugs, anything that would stick or harm me"); *United States v. Reyes*, 353 F.3d 148, 150, 154–55 (2d Cir. 2003) (holding that the exception applied when the officer, before handcuffing a suspect, asked whether he "had anything on him that could hurt the officer" (cleaned up)); *United States v. Lackey*, 334 F.3d 1224, 1225–27 (10th Cir. 2003) (holding that the exception applied when the officer, before patting down a suspect, asked, "Do you have any guns or sharp objects on you?").

¶28    Indeed, the facts here closely mirror the facts in *Lackey*, a case in which police sought to arrest the defendant. 334 F.3d at 1225. Once officers placed the defendant in handcuffs, but prior to advising him of his *Miranda* rights, an officer asked if the defendant "ha[d] any guns or sharp objects on [him]," to which the defendant responded that he did not have anything "on [him]" but that "there was a gun in the car." *Id.* at 1225–26. Officers then recovered a gun from the car. *Id.* On appeal, the court held that "the question was proper under the public safety exception to *Miranda* set forth in *Quarles*." *Id.* at 1226. The court explained its holding as follows:

> [T]he reasoning of *Quarles* applies squarely to the circumstances here. The focused question of the officers—"Do you have any guns or sharp objects *on you*"—addressed a real and substantial risk to the safety of the officers and [the defendant]: If [the defendant] was carrying such an item, he could use it against the officers or, perhaps more likely,

> someone could be seriously injured when [the
> defendant], who was already under arrest, was
> routinely searched or frisked.

*Id.* at 1227. The court also noted that it was "irrelevant" that the "principal danger . . . was the risk of injury to the officers or [the defendant] himself, rather than ordinary members of the 'public.'" *Id.* at 1227–28.

¶29    This case is materially indistinguishable from *Lackey*, and we therefore find that case persuasive. *Cf. State v. Fullerton*, 2018 UT 49, ¶ 3, 428 P.3d 1052 (noting that, "because *Miranda* is a matter of federal jurisprudence, our courts must be in lockstep with the United States Supreme Court" on *Miranda*-related matters). As in *Lackey*, officers placed the defendant (here, Millett) in handcuffs and asked whether he had any guns or sharp objects (here, needles) "on [him]." And, like the defendant in *Lackey*, Millett gave a partially nonresponsive answer to the question, telling officers that there were needles and a gun in the car. Here, too, the "principal danger" was risk of injury not to the general public but, rather, to the officers restraining him, to Girlfriend, or to Millett himself. *See Lackey*, 334 F.3d at 1227–28. But as the *Lackey* court noted, this is "irrelevant." *Id.* The key here is that officers were asking Millett—as he was being restrained—about his immediate access to weapons or needles, an inquiry that is deemed necessary to ensure the safety of those nearby. Under these circumstances, the public safety exception to *Miranda* is applicable.[2]

---

2. In this case, the trial court denied Millett's motion to suppress on different grounds, determining that the evidence in question would have inevitably been discovered. We are, however, authorized to affirm a trial court's decision on an "alternative basis," and—at the State's request—we elect to do so here. *State v. McLeod*, 2018 UT App 51, ¶ 21, 420 P.3d 122 ("We may affirm on any legal ground or theory apparent on the record." (cleaned up)).

¶30　Accordingly, we conclude that there was no violation of Millett's Fifth Amendment rights when officers asked him, while being restrained, about the presence of any guns or needles on him. On this basis, we affirm the trial court's ruling denying Millett's motion to suppress.

## II. Jury Selection Issues

¶31　Next, Millett registers two complaints about the jury selection process. First, he asserts that the trial court should have continued the trial due to the low number of available jurors. Second, he takes issue with the court's decision to overrule his for-cause objections to the three contested jurors. We reject both of Millett's arguments, but for different reasons.

¶32　Millett's first argument fails for lack of preservation. Millett points us to no place in the record where he asked the court to continue the trial. The record does indicate that an unrecorded in-chambers discussion took place about whether certain jurors should be struck for cause, which the parties attempted to summarize for the record when they returned to the courtroom. But that summary is devoid of any reference to a motion from Counsel to continue the case and, "as the appellant alleging error, [Millett] has the duty and responsibility of supporting such allegation by an adequate record." *Ajinwo v. Chileshe*, 2018 UT App 39, ¶ 2, 420 P.3d 51 (cleaned up). In the absence of a complete record, "we . . . presume the regularity of the proceedings." *Id.* ¶ 4 (cleaned up).[3] In this case, where the existing record contains no indication that Millett ever made a motion to continue, we will

---

3. There is, of course, an option open to litigants who believe there is a gap in the record: they can seek to reconstruct the part of the record they believe is not reflected in the record on appeal. *See* Utah R. App. P. 11(f) (providing an avenue by which parties can supplement or modify an incomplete record). Millett made no such motion in this case.

not assume that any such motion was made. Thus, Millett's appellate argument on that point is unpreserved for our review. *See State v. Mayorga*, 2024 UT App 182, ¶ 29, 561 P.3d 1184 ("To preserve any issue for appellate review, the issue must be specifically raised such that the issue was sufficiently raised to a level of consciousness before the trial court." (cleaned up)), *cert. denied*, Mar. 20, 2025 (No. 20241379). And Millett "does not ask us to apply any of our established exceptions to the preservation rule, such as plain error or ineffective assistance of counsel." *Id.* ¶ 34. On this basis, we reject Millett's argument that his case should have been continued to allow for a larger jury pool.

¶33 Second, Millett challenges the denial of his motions to strike three jurors for cause. Specifically, he asserts that the trial court should have granted his for-cause motions because those jurors had some level of relationship with either witnesses for the State or one of the prosecutors. But, on appeal, Millett makes no attempt to rebut or engage with the trial court's determination that the contested jurors were "adequately rehabilitated."

¶34 On appeal, a party's "[p]rincipal briefs must contain . . . [a]n argument" that explains, "with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal." Utah R. App. P. 24(a)(8). This means that "appellants carry the burden to persuade a reviewing court through reasoned, supported argument that the [trial] court committed harmful, reversible error—a burden that necessarily requires the appellant to address the reasoning and basis of the [trial] court's ruling and to explain why that court got it wrong." *Big Game Forever v. Peterson*, 2024 UT App 78, ¶ 19, 551 P.3d 411 (cleaned up); *see also Pinder v. Duchesne County Sheriff*, 2020 UT 68, ¶ 36, 478 P.3d 610 ("It is the appellant's job to tell us where and how the [trial] court went wrong."). If an appellant "does not meaningfully engage with the [trial] court's reasoning," that appellant "falls short of demonstrating any error on the part of the [trial] court." *Big Game Forever*, 2024 UT App 78, ¶ 19 (cleaned up);

*see also Pinder*, 2020 UT 68, ¶ 36 ("An appellant who fails to adequately brief an issue will almost certainly fail to carry its burden of persuasion on appeal." (cleaned up)).

¶35   In his principal brief, Millett fails to meet this burden. In fact, Millett's entire argument on this point is as follows:

> Defense counsel indicated on the record that he motioned for [the three jurors] to be stricken for cause, but the trial court determined that they had been rehabilitated and would not dismiss them since it needed them to remain in the pool to empanel a jury for this case.

Millett cites no case law regarding the standards for assessing the propriety of a court's decision regarding a for-cause objection. And Millett provides no record citations for, or even any descriptions of, the actual facts of the relationships that these jurors may have had with witnesses for the State or the prosecutors. This brief argument is simply insufficient to carry Millett's burden of appellate persuasion.

¶36   On this basis, we reject Millett's arguments that the trial court abused its discretion in denying his motions to strike the three jurors in question for cause.[4]

---

4. Even though Millett has not borne his burden of persuading us that the trial court abused its discretion in this case, we offer a word of caution to trial courts faced with the situation in which too few jurors are summoned for (or show up to) a trial. Initially, judges and court staff should do everything they can to avoid such situations in the first place and should err, if at all, on the side of calling too many (rather than too few) jurors. Such situations are to be avoided because—given the inertia attorneys,

(continued…)

III.  Toxicology Evidence

¶37    Next, Millett claims that, before allowing Scientist to testify about the results of the confirmation test she performed on Millett's blood sample, the trial court should have required the State to present testimony "regarding the calibration of the machine on which the initial test" was done and "regarding the initial test" in general. But we discern no abuse of discretion in the court's decision to allow Scientist to testify, notwithstanding the absence of testimony regarding calibration of the machine used on the initial test or the process of running the initial test itself.[5]

¶38    Our ruling in this regard turns on Scientist's testimony that the confirmation test was completely independent from the initial screening test and that the results of the confirmation test were in no way affected by the results of the initial screening. Indeed,

---

judges, litigants, and witnesses often feel to make sure a scheduled trial happens on the day it is set—the temptation can be quite real to water down for-cause assessments so that a jury can be empaneled and the trial will not have to be postponed. It should go without saying that the standards for assessing jurors' qualifications should not vary depending on the size of the jury pool. While courts should not be quick to postpone a trial, courts should not hesitate to do so when the jury pool is so small that it starts affecting the court's analysis regarding for-cause objections. Given our resolution of this issue, however, we stop well short of determining that the trial court here committed any sort of error; we offer these thoughts simply as general advice for future cases.

5. Millett also argued to the trial court that the State should have been required to present additional evidence regarding calibration of the machine used for the confirmation test. But Millett appears to have abandoned that argument on appeal, raising here only arguments about calibration of the machine used to conduct the screening test. We limit our analysis accordingly.

when asked directly whether "[t]he fact that there [are] toxicologists performing preliminary tests . . . affect[s] the . . . integrity and the reliability of the test [she] performed," Scientist answered unequivocally in the negative. And the State made no attempt to introduce or otherwise rely on the results of the initial screening test; indeed, it asked only for admission of the results of the confirmation test.

¶39 Under these circumstances, the trial court did not abuse its discretion by allowing Scientist to testify about the results of the confirmation test, even in the absence of testimony from the other toxicologist who performed the initial screening tests and calibrated the machine on which the initial tests were performed. We therefore reject Millett's arguments to the contrary.

### IV. Sufficiency of the Evidence on the Drug Paraphernalia Charge

¶40 Fourth, Millett challenges the court's ruling denying his motion for directed verdict regarding the drug paraphernalia charge. Specifically, Millett argues that there was insufficient evidence to support the charge, and he claims that he "was unaware" that most of the drug paraphernalia was in the vehicle. But here, there was at least "some evidence" to support the charge, *see State v. Graydon*, 2023 UT App 4, ¶ 26, 524 P.3d 1034 (cleaned up), and therefore the court did not err in denying Millett's directed verdict motion.[6]

---

6. The State asserts that Millett's sufficiency challenge is unpreserved. However, because we can resolve this issue on the merits in favor of the party asserting that the issue is unpreserved, we choose to do so. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation.").

¶41 In his arguments on appeal, Millett focuses entirely on the needles that were found in the car, and he asserts that "there was nothing presented to show that the [unused] needles had been used as drug paraphernalia" or that Millett "even knew the used needles were there or that he had used them." Accordingly, Millett asks this court to determine that the trial court should have granted his motion for a directed verdict on the charge. But Millett's argument fails because the paraphernalia charge was not based solely on the needles. Even if we are to assume—without deciding—that the State's evidence about the needles was insufficient, Millett's arguments fail because he does not mention the other evidence at play, namely the container and baggies, which were tested and contained methamphetamine residue.

¶42 The relevant statute defines drug paraphernalia as "any equipment, product, or material used, or intended for use, to . . . package, repackage, store, contain, conceal, inject, ingest, inhale, or to otherwise introduce a controlled substance into the human body." Utah Code § 58-37a-3(1). This statutory definition includes any "capsules, balloons, envelopes, and other containers used, or intended for use to package small quantities of a controlled substance," as well as "containers and other objects used, or intended for use to store or conceal a controlled substance." *Id.* § 58-37a-3(2)(i), (j).

¶43 Here, the search of the car recovered not only needles, but also "a baggie containing a clear liquid substance" as well as a "clear container," both of which contained residue that tested positive for methamphetamine. The baggie and container both clearly qualify as a "container" used to "package" or "store" a controlled substance. *Id.*

¶44 Millett makes no specific argument on appeal regarding these items. But even assuming that his argument about the used needles—that he didn't know they were there—was also intended to apply to the container and the baggie, the evidence here was

sufficient to create at least a jury question about whether Millett was in possession of them. These items were found in the driver's side door of a car Millett had been driving. *See State v. Ashcraft*, 2015 UT 5, ¶ 19, 349 P.3d 664 (stating that the constructive possession inquiry "depends upon the facts and circumstances of each case," including factors such as "ownership and/or occupancy of the residence or vehicle, presence of the defendant when the contraband is discovered, the defendant's proximity to the contraband, . . . and presence of contraband in a specific area where the defendant had control" (cleaned up)). And even before officers found the baggie and the container, Millett told them that they would find "needles in the door" of the car; it is a reasonable inference, from this statement, that Millett also knew about the other items of drug paraphernalia found in the same location.

¶45   Thus, under the specific circumstances presented here, the State presented at least "some evidence" on the drug paraphernalia charge "from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *See State v. Stricklan*, 2020 UT 65, ¶ 30, 477 P.3d 1251 (cleaned up). Accordingly, the trial court did not err in denying Millett's directed verdict motion on that count.

## V. Millett's Brief Absence from the Trial

¶46   Finally, Millett takes issue with the trial court's decision to proceed with the trial after he left the courtroom for a period of time. Millett claims that the court did not adequately establish that he left the courtroom knowingly and voluntarily. But here, the record clearly establishes that Millett was aware of his rights and left the courtroom voluntarily.

¶47   The Utah Constitution protects defendants' "right to appear and defend in person and by counsel." Utah Const. art. I, § 12. But this right "may be waived under certain circumstances if the defendant voluntarily absents himself from the trial." *State*

*v. Houtz*, 714 P.2d 677, 678 (Utah 1986). In situations like this one, "it is the burden of the prosecution to show that an absent defendant has knowingly and voluntarily waived that right before trying him or her in absentia." *State v. Pando,* 2005 UT App 384, ¶ 16, 122 P.3d 672 (cleaned up).

¶48 To determine whether a defendant has "knowingly and voluntarily waived" the right to attend the proceedings, we first look to any "direct evidence" of "the defendant's whereabouts." *Id.* (cleaned up). Such direct evidence can constitute "sufficient information to assess whether [the defendant's] absence was voluntary." *Id.* ¶ 18. In the absence of direct evidence, "the trial court will ordinarily postpone the proceedings." *Id.* ¶ 16. Finally, as the reviewing court, we will affirm the trial court's conclusion that the defendant was voluntarily absent "if the facts support" that conclusion when considering "the totality of the circumstances." *Id.* ¶ 19 (cleaned up).

¶49 Here, Millett's absence was clearly voluntary. In this case, there is "direct evidence" of Millett's "whereabouts." *Id.* ¶ 16 (cleaned up). In the midst of trial, Millett personally informed the court that he wanted to leave the courtroom to retrieve a motion he had written. Millett's own words and actions informed the court exactly why he was leaving and where he was going. Moreover, the court advised Millett not to leave and informed him of the consequences of not waiting until a recess to retrieve the motion. Indeed, the trial court told Millett that if he left, the trial would "go[] forward" and that it would not "look good" for him, but that it would be his "choice." These facts, taken together, "support the trial court's conclusion" that Millett's temporary absence was knowing and voluntary, and we accordingly discern no error in the court's decision to proceed with the trial during his absence. *Id.* ¶ 19.

CONCLUSION

¶50    The trial court did not err in denying Millett's motion to suppress. Millett has not shown any abuse of discretion in the court's handling of jury selection matters. The court did not abuse its discretion by allowing Scientist to testify about the results of the confirmation test, even in the absence of testimony from the other toxicologist who performed the initial screening tests. The court committed no error in denying Millett's directed verdict motion regarding the drug paraphernalia count. And the court did not err in proceeding with the trial during Millett's temporary voluntary absence.

¶51    Affirmed.

_____